2020 IL App (1st) 172511

FIRST DISTRICT
SIXTH DIVISION
September 25, 2020

No. 1-17-2511

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 00 CR 17565 (02) |
| | ) | |
| ROBERTO HAYNIE, | ) | Honorable |
| | ) | Paula M. Daleo, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Mikva and Justice Cunningham concurred in the judgment and opinion.

## OPINION

¶ 1    Defendant, Roberto Haynie, appeals his sentence of 60 years' imprisonment, imposed after the trial court conducted a new sentencing hearing in order to consider the characteristics of youth as required by *Miller v. Alabama*, 567 U.S.460 (2012). On appeal, defendant contends that his sentence is unconstitutional because (1) it is a *de facto* life sentence and the court did not find that he was "beyond the possibility of rehabilitation," (2) his sentence was excessive and did not give proper weight to his rehabilitative potential, and (3) his sentence violated the proportionate penalties clause of the Illinois Constitution. For the following reasons, we vacate defendant's sentence and remand for a new sentencing hearing.

¶ 2                                 I. JURISDICTION

¶ 3    The trial court sentenced defendant on October 16, 2017. Defendant filed a motion to reconsider sentence, which the trial court denied on October 16, 2017. Defendant filed a notice of

appeal on that same day. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 (eff. Feb. 6, 2013) and 606 (eff. July 1, 2017), governing appeals from a final judgment of conviction in a criminal case entered below.

¶ 4                                          II. BACKGROUND

¶ 5      After a jury trial, defendant was found guilty of two counts of first degree murder. The evidence at trial showed that on June 29, 2000, Ruben Pulido and Mark Lopez, both 13 years old, were outside playing basketball with friends. Around 10 p.m., Pulido and Lopez joined friends on the front porch of Arturo Nurgaray's house, located at 1639 South 58th Court in Cicero, Illinois. A boy on a bicycle, later identified as Juan Casillas, approached the group and told them that "this was Rocho's hood." Nurgaray responded, "We don't care," and told Casillas not to "disrespect" in front of his house. While this exchange occurred, defendant was hiding behind a car directly across the street from Nurgaray's house.

¶ 6      Casillas threw down his bicycle and yelled, "Light 'em up!" Defendant then stood up and began firing at the group on the porch. After the shots were fired, defendant and Casillas rode away on their bicycles. Pulido and Lopez were shot in the back, and both were taken to the hospital, where they later died.

¶ 7      After interviewing witnesses who identified Casillas as the person who ordered the shooting, the police arrested Casillas. The investigation continued, and defendant was subsequently arrested. Although several witnesses identified Casillas in a lineup, no witness could identify defendant in a lineup.

¶ 8     Defendant was 16 years old at the time of the shooting. After defendant was taken into custody, detectives contacted defendant's mother and assigned Detective Rudy Sirgedas as a youth officer responsible for defendant. Defendant's mother arrived at the police station, and in her presence the assistant state's attorney and Detective Sirgedas interviewed defendant. After the interview, defendant agreed to give a videotaped statement.

¶ 9     In the videotaped statement, defendant stated that he had been a member of the Latin Counts gang since he was 12 years old. On the night of the shooting, he and Casillas saw a group of people on 58th Court. Casillas, who was on a bike, started yelling gang slogans, and then he ordered defendant to "light these motherf*** up!" Defendant got off his bike and shot four times in the direction of the group on the porch. He and Casillas then rode away on their bikes. Defendant later hid the gun and the bicycle and gave instructions to other gang members as to where they were hidden.

¶ 10    The jury found defendant guilty of two counts of first degree murder, and defendant was sentenced to natural life in prison. On appeal, this court affirmed defendant's conviction. *People v. Haynie*, 347 Ill. App. 3d 650 (2004). The supreme court denied defendant's petition for leave to appeal. *People v. Haynie*, 211 Ill. 2d 595 (2004) (table).

¶ 11    On October 19, 2004, defendant filed a petition for postconviction relief, which the trial court denied. The record contains no appeal from this denial.

¶ 12    On June 5, 2009, defendant filed a *pro se* motion to "Expunge and Vacate Under the Illinois Constitution." In his motion, defendant alleged that (1) the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2000)) was unconstitutional and (2) the trial court lacked jurisdiction to transfer and try defendant as an adult. The trial court denied defendant's motion, and this court

granted appellate counsel's motion to withdraw, affirming the trial court's judgment. *People v. Haynie*, No. 1-09-2141 (Mar. 8, 2010) (unpublished order pursuant to Illinois Supreme Court Rule 23).

¶ 13    Defendant filed a *pro se* successive postconviction petition on June 18, 2013. In the petition, defendant alleged that his sentence of natural life in prison violated the eighth amendment under *Miller* and violated the Illinois proportionate penalties clause. In a supplemental petition, defendant argued that the mandatory nature of his sentence did not allow the trial court to consider the relevant characteristics of youth, or his rehabilitative potential, as required by *Miller*. The State agreed that, in light of *Miller*, defendant was entitled to a new sentencing hearing.

¶ 14    At the new sentencing hearing, the State presented as aggravation defendant's videotaped statement and a copy of the transcript. The State also read into the record the victim impact statements of the victims' mothers. The letters expressed enormous grief on the part of the families for the loss of two 13-year-old boys who had so much life ahead of them. Priscilla Berzosa, Pulido's sister, testified that Lopez and Pulido were "good kids." They asked that the court "reinstate the original sentence of life without parole" and stated that in "August 2001 we were given a glimmer of justice ***. We were told our boys' murderer would never be free to harm another person."

¶ 15    The State also presented the presentence investigation report (PSI) from 2001, indicating that defendant pled guilty to aggravated arson, a Class X felony, and was adjudged delinquent in 1989 and placed on juvenile probation.

¶ 16    Defendant addressed the court at the hearing. He apologized to the Lopez and Pulido families. He stated that he was now a man, "no longer a 16-year-old child who can be told to shoot

someone." At the time of the shooting, defendant "was a follower who just wanted to fit in." He was no longer part of a gang and was "truly sorry." While incarcerated, defendant has mentored other inmates, worked in the prison kitchens, and applied to take self-improvement classes. In his 17 years in prison, defendant has not received any disciplinary tickets. Defense counsel argued that "[d]efendant's criminal conduct was the result of circumstances unlikely" to recur.

¶ 17     Defendant's sisters testified that defendant was a caring brother and they have a close relationship with him. They offered to provide defendant with a place to live if he is released from prison. His sister Ella testified that their father was a heavy drinker who would hit her. They moved with their mother to Cicero and lived across the street from their older cousin, Marlow. Marlow belonged to a gang, and defendant began to spend more time with him. Marlow introduced defendant to illegal drugs.

¶ 18     Clinical neuropsychologist Dr. Robert Hanlon also testified in mitigation. He stated that, at 16 years old, defendant's brain was immature and that, during adolescence, the brain undergoes four major developments. This period of change can result in emotion-driven behavior and affects a person's ability to plan, make decisions, and solve problems. Dr. Hanlon opined that defendant's behavior on the night of the shooting was impulsive in that defendant did not think about the consequences of taking orders from Casillas. He concluded that defendant's immature brain limited his ability to make decisions that an adult would make in the same situation. Dr. Hanlon recently tested defendant using "multiple standardized neuropsychological tests" that assess executive functions, and defendant "performed within normal limits on all those tests."

¶ 19     In imposing defendant's sentence, the trial court stated:

"So this case comes before me for resentencing based on the decision promulgated by U.S. Supreme Court [*sic*] in Miller versus Alabama and its progeny, which in summary stated that a mandatory sentence of natural life for a juvenile offender violates the Eighth Amendment against cruel and unusual punishment.

The U.S. Supreme Court did not slam the door on a natural life sentence for a juvenile offender but stated that a mandatory sentence was unconstitutional thereby allowing a discretionary life sentence to be imposed for the right defendant, someone the Court, the Supreme Court, described as incorrigible. In other words, a person who is unable to be corrected, improved, or reformed.

The only thing to be determined here today is whether the defendant should be re-sentenced to a discretionary sentence of natural life or a term of years.

In making this determination regarding the imposition of a discretionary life sentence *** I am mandated to weigh the facts of the case, any statutory aggravating factors, any statutory mitigating factors as well as any additional mitigating factors suggested by the U.S. Supreme Court."

¶ 20 In aggravation, the court found that serious harm in the form of death occurred. It also considered the age of the offenders, noting that defendant was 16 years old at the time. Regarding defendant's participation in the crime, the court found that defendant admitted to firing a gun multiple times into a group of people on the porch. Defendant also had a criminal history and was on juvenile court probation when the shooting occurred. Defendant had belonged to a gang since he was 12 years old and had been shot and injured by a rival gang member. The court found that the shooting was gang related. The trial court further stated that, "[i]f we're ever to have order in

our society, there must be consequences for our actions. *** So the sentence I impose today is necessary to deter others from committing the same crime."

¶ 21    In mitigation, the court acknowledged Dr. Hanlon's testimony "regarding the brains of adolescents and their developments and how that affects their judgment." The court also found that there was no specific plan to shoot the victims but that defendant and Casillas "were just out looking for other gang members." Another mitigating factor the court considered was the "peer pressure involved in this incident." The court found

"no doubt *** that the defendant was out that night under orders from an older gang member seeking retribution from some wrong done to Juan Casillas.

As a matter of fact, there is testimony *** that when the defendant had enough of being shot at that night and roaming the neighborhoods and indicated that they should go home, Juan Casillas said [']No, just one more location.['] Unfortunately.

I'm also to look in mitigation at the actions of the defendant for the 17 years that he has been in custody. This is a factor that the Miller decision has required us to take a look at ***.

And in resentencing, I'm taking into consideration that he has not joined a gang, even though he had been an active gang member for the five years prior to his incarceration. Instead, he has chosen to mentor younger gang members while incarcerated. His actions in the penitentiary are also considered by me in determining his potential for rehabilitation.

Another factor that we're asked to consider is whether the defendant has family support. I've read the letters from the family members and friends and believe that he is and will always have the love and support of his family. *** I believe that he's proven by

his actions in the penitentiary that he is truly sorry for his actions that night and has apologized to *** the families for those actions. I believe that it was a heartfelt apology and not something he just says because he knows that I have to resentence him."

¶ 22 The trial court declined to apply extended term sentencing provisions requested by the State but believed that consecutive sentencing did apply. The trial judge acknowledged that the case "weighed heavily on me" and "[t]here is no sentence, natural life or a term of years, that will bring Ruben and Mark back to their families." The court stated that it must balance all the mitigating factors, including defendant's "brain development at the time of these murders, *** against the senseless nature of the crime." The court continued,

"Gang violence rules our streets today. That hasn't changed for 17 years. I believe it's worse. I must balance that against the lives of two young 13-year-old boys who will never get a chance to reach their potential and the devastating impact their deaths have had on their families and friends."

¶ 23 The court sentenced defendant to 30 years in prison for each of the victims, with the sentences to run consecutively. Defendant filed this appeal.

¶ 24                                         III. ANALYSIS

¶ 25 Defendant contends his 60-year sentence is a *de facto* life sentence that runs afoul of the constitutional principles set forth in *Miller*, because the court did not find he was "beyond the possibility of rehabilitation." Defendant argues that his sentence is unconstitutional as applied to the facts and circumstances of his case. His constitutional challenge is a legal question that we review *de novo*. *People v. Vega*, 2018 IL App (1st) 160619, ¶ 52.

¶ 26    The Supreme Court in *Miller* determined that "children are constitutionally different from adults for purposes of sentencing" due to their "diminished culpability and greater prospects for reform." *Miller*, 567 U.S. at 471. As *Miller* explained:

> "First, children have a 'lack of maturity and an underdeveloped sense of responsibility,' leading to recklessness, impulsivity, and heedless risk-taking. [Citation.] Second, children 'are more vulnerable . . . to negative influences and outside pressures,' including from their family and peers; they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings. [Citation.] And third, a child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].' [Citation.]" (Internal quotation marks omitted.) *Id.*

Not only do these characteristics diminish a juvenile's culpability, but these "distinctive attributes of youth diminish the penological justifications" for imposing life without parole on juvenile defendants. *Id.* at 472. *Miller*, therefore, concluded that a mandatory sentence of life without parole posed "too great a risk of disproportionate punishment" and required that, before imposing such a sentence, the sentencing judge must consider "how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 479-80.

¶ 27    In *Montgomery v. Louisiana*, 577 U.S. ___, ___, 136 S. Ct. 718, 734 (2016), the Court elaborated that the sentencing of a juvenile to life without parole is "excessive for all but the rare juvenile offender whose crime reflects irreparable corruption." (Internal quotation marks omitted.) "Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects 'unfortunate yet

transient immaturity' " of youth rather than "irreparable corruption." (Internal quotation marks omitted.) *Id.* at ___, 136 S. Ct. at 734. Therefore, in order to comply with the eighth amendment's prohibitions, the judge at a sentencing hearing must consider " 'youth and its attendant characteristics' " so that juveniles who may be sentenced to life without parole can be separated from those who may not. *Id.* at ___, 136 S. Ct. at 735.

¶ 28    Our supreme court applied the holding in *Miller* to a "mandatory term-of-years sentence that cannot be served in one lifetime." *People v. Reyes*, 2016 IL 119271, ¶ 9. In *People v. Buffer*, 2019 IL 122327, the court specifically addressed what constitutes a *de facto* life sentence for a juvenile defendant. It noted the recent enactment of a new statutory sentencing scheme for defendants under the age of 18 when they committed their offenses. *Id.* ¶ 36; see 730 ILCS 5/5-4.5-105 (West 2016). The statute provides that, for defendants convicted of first degree murder committed while a juvenile, who would otherwise be subjected to natural life in prison, "the court shall impose a sentence of not less than 40 years of imprisonment." 730 ILCS 5/5-4.5-105(c) (West 2016).

¶ 29    From this provision, the court extrapolated that "a prison sentence of 40 years or less imposed on a juvenile offender" offers a " 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' " (Internal quotation marks omitted.) *Id.* ¶ 41 (quoting *Miller*, 567 U.S. at 479). Therefore, the court held that "[i]n determining when a juvenile defendant's prison term is long enough to be considered *de facto* life without parole, we choose to draw a line at 40 years." *Id.* ¶ 40. It follows that a sentence of imprisonment over 40 years is a *de facto* life sentence for a juvenile defendant.

¶ 30    Defendant was 16 years old when he committed the offenses and, after a new sentencing hearing in which the trial court acknowledged *Miller*, he was sentenced to 60 years in prison for the murders of Pulido and Lopez. He must serve his sentence in its entirety. See 730 ILCS 5/3-6-3(a)(2)(i) (West 2016) (requiring that a defendant "who is serving a term of imprisonment for first degree murder *** shall receive no sentence credit and shall serve the entire sentence imposed by the court"). We recognize that, when the trial court sentenced defendant, it did not have the benefit of *Buffer* and could not know that his 60-year sentence was a *de facto* life sentence. However, if the record shows that the trial court properly considered defendant's youth and its attendant characteristics at the time of sentencing, his sentence may stand. *People v. Holman*, 2017 IL 120655, ¶ 47.

¶ 31    In *Holman*, our supreme court looked at the defendant's original sentencing hearing to determine whether it complied with *Miller*. The court determined that, "[u]nder *Miller* and *Montgomery*, a juvenile defendant may be sentenced to life imprisonment without parole, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Id.* ¶ 46. The trial court may make that decision only after considering defendant's youthful attributes including, but not limited to:

> "(1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressure that may have affected him; (4) the juvenile defendant's incompetence, including his inability

to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Id.* ¶ 46.

¶ 32 Here, the trial court noted defendant's young age at the time of the shootings and Dr. Hanlon's testimony "regarding the brains of adolescents and their developments and how that affects their judgment." Defendant has positive family support, as indicated by the testimony of his sisters. The court also found that defendant was likely influenced by Casillas, an older gang member who ordered defendant to shoot. Defendant wanted to go home before the shooting incident, but Casillas told him, "No, just one more location." As for his degree of participation, defendant admitted to shooting into a group of people. The court made no finding regarding defendant's incompetence or his incapacity to deal with police or with attorneys.

¶ 33 Significantly, nothing in the record supports a finding that defendant's conduct reflected irreparable corruption beyond the possibility of rehabilitation. Rather, the court acknowledged that defendant was no longer in a gang and that, while incarcerated, he mentored younger gang members. It also believed that defendant was "truly sorry" for his actions, noting his "heartfelt apology." The court, however, balanced these mitigating factors "against the senseless nature of the crime" and "against the lives of two young 13-year old boys who will never get a chance to reach their potential and the devastating impact their deaths have had on their families and friends." The court believed that, "[i]f we're ever to have order in our society, there must be consequences for our actions. *** So the sentence I impose today is necessary to deter others from committing the same crime."

¶ 34 The court's focus on deterrence, in particular, is incongruous with *Miller*'s concerns regarding the sentencing of juvenile defendants. As *Miller* explained, "the distinctive attributes of

youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Miller*, 567 U.S. at 472. Deterrence cannot serve its purpose in sentencing if the same characteristics of immaturity, recklessness, and impetuosity in juveniles "make them less likely to consider potential punishment." *Id.*

¶ 35    In sentencing defendant, the trial court made no finding that he was incorrigible or incapable of being reformed. Instead, the court indicated that defendant was capable of rehabilitation. Moreover, deterrence weighed heavily in the court's mind when it sentenced defendant, even though the justifications for punishment are diminished for juvenile defendants. We find that defendant's *de facto* life sentence did not comply with *Miller* and *Holman*. Accordingly, we vacate his sentence and remand for a new hearing pursuant to section 5-4.5-105 of the Code. *Holman*, 2017 IL 120655, ¶ 45; see also *People v. Reyes*, 2020 IL App (2d) 180237, ¶ 32 (finding that, although the trial court considered the *Miller* factors, a new sentencing hearing was required because the record did not support a determination that the defendant was among the rarest of juvenile offenders whose conduct showed permanent incorrigibility beyond the possibility of rehabilitation).

¶ 36    Due to our disposition of this issue, we need not consider defendant's remaining issues on appeal.

¶ 37                                IV. CONCLUSION

¶ 38    For the foregoing reasons, we vacate defendant's sentence and remand for a new sentencing hearing that complies with *Miller* and *Holman*.

¶ 39    Sentence vacated and cause remanded.

**No. 1-17-2511**

| | |
|---|---|
| **Cite as:** | *People v. Haynie*, 2020 IL App (1st) 172511 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 00-CR-17565(02); the Hon. Paula M. Daleo, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Emily E. Filpi, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Miles J. Keleher, and William Kelly, Assistant State's Attorneys, of counsel), for the People. |