2022 IL App (1st) 200463

FIRST DISTRICT
SIXTH DIVISION
April 22, 2022

No. 1-20-0463

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 94 CR 26814 01 |
| | ) | |
| PHILLIP THOMPSON, | ) | Honorable |
| | ) | Thomas Joseph Hennelly, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Pierce concurred in the judgment and opinion.
Justice Oden Johnson dissented, with opinion.

## OPINION

¶ 1    Defendant, Phillip Thompson, appeals the circuit court's dismissal of his postconviction petition at the first stage. On appeal, defendant contends that his sentence of 80 years' imprisonment for a murder that was committed when he was 18 years old was unconstitutional pursuant to *Miller v. Alabama*, 567 U.S. 460 (2012), and its progeny; therefore, his petition was neither frivolous nor patently without merit. For the following reasons, we affirm.

¶ 2                                    I. JURISDICTION

¶ 3    The circuit court dismissed defendant's postconviction petition on January 10, 2020. Defendant filed a notice of appeal on February 10, 2020. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 651 (eff. July 1, 2017), governing appeals in postconviction proceedings.

¶ 4                                II. BACKGROUND

¶ 5      A full accounting of the facts can be found in this court's order involving defendant's direct appeal. See *People v. Thompson*, No. 1-96-0711 (1997) (unpublished order under Illinois Supreme Court Rule 23). We set forth only the facts necessary to the disposition of this appeal.

¶ 6      On October 10, 1994, the police discovered David Grover on the floor of his bedroom, bleeding from a gunshot wound to his head. Three shotgun shells were found in the hall leading to Grover's room, and at least two shots hit the door of his room. Grover was transported to the hospital where he later died.

¶ 7      A man who lived near Grover told police he saw members of the Mafia Vice Lords gang run into a nearby building around the time shots were fired. Police subsequently arrested defendant and DeWayne Bolden, two members of the gang. Defendant was 18 years old at the time.

¶ 8      On February 7, 1995, after defendant's arrest but prior to his trial, defendant was charged with murder in relation to the robbery and beating death of Mark Simms. This incident occurred on June 15, 1992, when defendant was 15 years old.

¶ 9      Regarding the murder of Grover, the trial court conducted simultaneous jury trials of defendant and Bolden before separate juries. At the trial, Donald Hardy testified that in 1994, he belonged to the Mafia Vice Lords. On October 10, 1994, he saw Bolden and several other members of the gang holding baseball bats in front of Grover's apartment building. Hardy saw Grover leaning out of his window and arguing with Bolden about money. Bolden went into the doorway of Grover's building, and defendant, who was carrying a shotgun, ran toward the back of the building. Hardy heard three gunshots coming from the building. He saw people running to different

buildings, and he ran in the opposite direction. Hardy saw defendant, who handed him the shotgun and told him to get rid of it. Hardy testified that he hid the gun in a nearby abandoned building.

¶ 10    The next day, defendant said to Hardy, "I brought my s*** straight to [Grover]." Hardy explained that defendant meant he shot Grover. Defendant said that Grover owed money to the gang. Later that day, Hardy was picked up by police, and he showed them the shotgun in the abandoned building.

¶ 11    Felicia Wright, Grover's girlfriend, testified that on October 10, 1994, Grover was arguing with people, and she heard gangs mentioned. She then heard someone run up the back stairs of the apartment building. Wright stepped out of the room, and Grover slammed his door shut. She saw defendant pass her as he held a shotgun. He told her to move out of the way before he fired a shot at Grover's door. Wright then heard two more shots. She admitted that on the day of the shooting, she told police she was not in the building when the shooting occurred. She lied because she was "scared to death" and "didn't want to have anything to do with it." Wright came to testify only because police arrested her for failure to respond to the State's subpoena.

¶ 12    The medical examiner determined that Grover died from a gunshot to his head. The cluster of pellets indicated that the gun discharged within three feet of his head, although the examiner could not be certain of the distance because medical personnel cleaned the wound while Grover was alive. In his opinion, the gunpowder residue and close cluster of pellets indicated that the gun was probably in contact with Grover's head when it discharged.

¶ 13    The defense rested without presenting any evidence, and the jury found defendant guilty of first degree murder.

¶ 14    At defendant's sentencing hearing, the State presented evidence related to defendant's juvenile offenses. On November 21, 1991, an officer observed defendant engaged in four hand-to-hand drug transactions. Police recovered 54 packets of cocaine from defendant. On March 31, 1992, another officer responded to reports of a gang commotion in the area of Grover's building. People ran when police arrived, but defendant did not run. The officer searched defendant and found 11 .32-caliber bullets in his pocket. Defendant gave police a fake name and birth date. Another officer testified that in 1992, he saw defendant and another man fire into a crowd in the street, injuring a woman. Defendant fled, and during the chase by police, he pointed a gun at them. When police stopped defendant, he gave them a fake name and address. A presentence investigation report showed defendant's juvenile adjudications of guilt for (1) 1989 aggravated battery and robbery and (2) 1992 aggravated battery, aggravated discharge of a firearm, and other weapons charges.

¶ 15    The State also informed the court that in 1992, defendant and "two partners" chased Mark Simms down two flights of stairs, punching and beating him until he was unconscious. The parties stipulated that Simms was found in a stairwell at 4120 South Prairie on June 15, 1992, and that he suffered from numerous blunt trauma injuries. He was taken to the hospital, where he remained in a coma until his death on November 17, 1992.

¶ 16    The presentence report also showed that defendant has been a gang member since he was 14 years old and that he smoked an ounce of marijuana a day. The officer who prepared the report noted that defendant appeared to have been the subject of an abuse and neglect finding and was once in the care of the Department of Children and Family Services (DCFS). However, defendant denied having been in DCFS custody. He also denied experiencing any abuse or neglect.

Defendant's parents were divorced when he was very young. He stated that he has a good relationship with his mother, with whom he lives, and an "okay" relationship with his father, who works as a janitor at the Chicago Housing Authority. Defendant told the officer that "no one in his family has a criminal background, and that no one in his family abuses alcohol or drugs." He left school in the tenth grade as a result of his juvenile adjudications, but he earned his General Equivalency Diploma while at the Illinois Youth Center. He has two children, who live with their mother in Indiana.

¶ 17    At the sentencing hearing, defendant's counsel argued that the court should "take into consideration all of [defendant's] background, his whole history." He pointed to the fact that defendant's parents were divorced and, as a result, any influence his father had over defendant "diminished to the point that he associated with the Vice Lords." Counsel argued that the juvenile system failed defendant. He had "great potential for rehabilitation," and counsel asked for a sentence that will "give him sufficient hope in the end to be able to rehabilitate himself in prison so that when he is released he becomes a functioning, contributing member of society." Defendant also addressed the court, stating that he was "sorry for what happened."

¶ 18    In sentencing defendant, the trial court stated:

> "Okay. As I was saying, the system does appear to have failed in this case, not only failed Mr. Thompson but failed society, failed certainly the victim, the victims' [*sic*] family and Mr. Thompson's family also. I can't say that the system should be the one to be blamed. Certainly there is more than enough blame to be shouldered by Mr. Thompson who had opportunities to change his lifestyle, to change his attitudes. There are hundreds, perhaps thousands perhaps tens of thousands of people who grow up in the same neighborhoods

across this country, the same kind of neighborhood Mr. Thompson grew up in. Some of them grew up in the same sort of family difficulties, members of broken homes or single family parents that don't turn out to be murderers.

There can be no question that in this case Mr. Thompson acted on behalf of his gang, acted the way he had been acting it appears for quite some time ***, a circle of violence that remained unbroken until he was brought in to Cook County Jail it appears. Nothing seemed to stop the escalation of the violence and the criminal activity that Mr. Thompson was engaged in until he was arrested.

I don't see anything that would indicate to me that Mr. Thompson *** has any tremendous remorse because of placing the gun to the head of a person *** and pulling the trigger. That in addition to all the other aggravation the State has presented to this Court shows to me that Mr. Thompson is probably not fit to be rehabilitated, at least not in the terms that most of us would think would be any time soon.

My only hope is that during the period of time that Mr. Thompson is incarcerated that other people aren't hurt by a guy who obviously holds life so cheaply that he has no problem committing these types of offenses. It will be the order of this Court that Mr. Thompson be sentenced to a period of 80 years in the Illinois Department of Corrections.

I'm extending the term to 80 years because of the defendant's background and because of the particularly brutal and heinous nature of this offense. This offense could be characterized as a cold-blooded assassination of the victim in this manner."

¶ 19    On December 27, 1995, after a separate bench trial, the court found defendant guilty of the murder of Simms. Defendant was 15 years old at the time of the murder. The trial court sentenced

defendant to a mandatory life sentence for the murder, along with a concurrent sentence of seven years for his robbery conviction. Defendant subsequently filed a postconviction petition challenging his sentence as unconstitutional pursuant to *Miller*. Although the postconviction proceedings are not in the record, the parties agree that the trial court subsequently vacated defendant's sentence and he was resentenced to concurrent terms of 60 years' and 7 years' imprisonment, respectively.

¶ 20    Defendant filed a direct appeal of his conviction for the murder of Grover, raising evidentiary and sentencing issues. This court affirmed his conviction and sentence in *Thompson*, No. 1-96-0711.

¶ 21    On December 2, 2019, defendant filed his postconviction petition. Therein, he argued that he was serving a *de facto* life sentence for offenses that occurred when he was a young adult, and that he was entitled to a new sentencing hearing. He further asserted that his sentence of 80 years' imprisonment "violates the proportionate penalties clause of the Illinois constitution." Defendant acknowledged that he was not a juvenile but argued that the eighth amendment "may be violated as applied to a particular young adult over the age of 18, where, based on science and the [defendant's] individual circumstances, he demonstrates that he is sufficiently similar to juveniles such that *Miller* should apply." As support, defendant cited articles finding that the brain continues to mature into one's early twenties, indicating that *Miller*'s protections should extend to young adults. He also attached interviews with his family members and his medical, education, and placement records.

¶ 22    After reviewing defendant's petition, the court found that *Miller* was inapplicable "because of his age." The court ruled that the petition was frivolous and patently without merit and denied leave to file it. Defendant filed this appeal.

¶ 23                                    III. ANALYSIS

¶ 24    The Post-Conviction Hearing Act provides a three-stage process for adjudicating a postconviction petition. See 725 ILCS 5/122-1 (West 2018). Defendant's petition was dismissed at the first stage. At the first stage, the trial court may dismiss a petition only if it is frivolous or patently without merit. *People v. Harris*, 224 Ill. 2d 115, 125-26 (2007). Because most postconviction petitions at this stage are drafted by *pro se* defendants, the threshold for survival at the first stage is low. *People v. Allen*, 2015 IL 113135, ¶ 24. The petition need only allege facts sufficient to state the "gist" of a constitutional claim. *People v. Jones*, 211 Ill. 2d 140, 144 (2004). However, the trial court may dismiss a petition at this stage if it has "no arguable basis either in law or in fact" and relies on "indisputably meritless" legal theories. *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). A legal theory is meritless if it is completely contradicted by the record. *Id.* at 16-17. We review the trial court's first stage dismissal *de novo*. *People v. Swamynathan*, 236 Ill. 2d 103, 113 (2010). Additionally, we can affirm the dismissal on any basis that appears in the record. *People v. Wilson*, 2014 IL App (1st) 113570, ¶ 41.

¶ 25    Defendant argues that the court erred in dismissing his petition where it presented a gist of a constitutional claim. His petition alleged that his *de facto* life sentence of 80 years' imprisonment violates the proportionate penalties clause as applied to him because the trial court did not fully consider the characteristics of youth when imposing his sentence. He acknowledges that he was 18 years old when he committed the offense, but contends he was entitled to *Miller*'s protections

because studies have shown that his brain, like those of juvenile defendants, was still developing in areas relevant to maturity and moral culpability.

¶ 26     It is well established under *Miller* and its progeny that a mandatory sentence of life imprisonment for a juvenile offender, with no opportunity to consider the "distinctive attributes of youth," violates the eighth amendment because such a sentence "poses too great a risk of disproportionate punishment." *Miller*, 567 U.S. at 472, 479. Although *Miller* involved a juvenile's mandatory life sentence, our supreme court found that the reasoning in *Miller* applied equally to juveniles who received any life sentence, whether mandated by statute or upon discretion of the sentencing court. See *People v. Holman*, 2017 IL 120655, ¶ 40. Two years later, the court extended *Miller*'s protections to juveniles who received a *de facto* life sentence or a sentence of more than 40 years' imprisonment. See *People v. Buffer*, 2019 IL 122327, ¶ 41.

¶ 27     In *Buffer*, the supreme court noted that the imposition of mandatory life sentences for juveniles is prohibited because such sentences do not provide a meaningful opportunity for release " 'based on demonstrated maturity and rehabilitation.' " (Internal quotation marks omitted.) *Id.* ¶ 20 (quoting *Miller*, 567 U.S. at 479). Based on *Miller*'s rationale, the court found that a prison sentence of a term of years, other than life imprisonment, could be "the functional equivalent of life without parole" if it did not provide juvenile defendants a meaningful opportunity for release. *Id.* ¶¶ 29, 41. Extrapolating from recent legislative enactments, the court concluded that "a prison sentence of 40 years or less imposed on a juvenile offender provides some meaningful opportunity to obtain release" and therefore, "does not constitute a *de facto* life sentence in violation of the eighth amendment." *Id.* ¶ 41. While the court noted the objections against categorical rules, it drew the line at 40 years because " '[c]lear, predictable, and uniform constitutional standards are

especially desirable' in applying the eighth amendment." *Id.* ¶ 29 (quoting *Roper v. Simmons*, 543 U.S. 551, 594 (2005) (O'Connor, J., dissenting)).

¶ 28 It follows that to prevail on his *Miller*-based claim, defendant must show that he "was subject to a life sentence, mandatory or discretionary, natural or *de facto*." *Id.* ¶ 27. Defendant was sentenced to 80 years' imprisonment. At the time defendant committed the murder, section 3-6-3 of the Unified Code of Corrections provided, in pertinent part, that he "shall receive one day of good conduct credit for each day of service in prison other than where a sentence of 'natural life' has been imposed. Each day of good conduct credit shall reduce by one day the inmate's period of incarceration set by the court." 730 ILCS 5/3-6-3(a)(2) (West 1994). In August 1995, the legislature amended section 3-6-3, eliminating statutory sentencing credit for any offender who committed first degree murder. See Pub. Act 89-404, § 40 (eff. Aug. 20, 1995) (amending 730 ILCS 5/3-6-3(a)(1), (a)(2)(i)). This "truth in sentencing" law was later stricken, but then reinstated as of June 19, 1998. See 730 ILCS 5/3-6-3 (West 1998). The truth in sentencing law, as validly enacted in 1998, does not apply retroactively to cases where the murder occurred prior to that date. *People v. Reedy*, 186 Ill. 2d 1, 17-18 (1999).

¶ 29 The murder in this case occurred in 1994. As defendant acknowledges, he is entitled to the day-for-day statutory sentencing credit. The State argues that because defendant is entitled to the day-for-day credit, he need only serve 40 years of his 80-year sentence. Therefore, defendant's sentence is not a *de facto* life sentence under *Buffer*. We agree.

¶ 30 In *People v. Dorsey*, 2021 IL 123010, ¶ 49, our supreme court considered the effect of day-for-day sentencing credit "on the question of whether a *de facto* life sentence without the possibility of parole has been imposed." The defendant in *Dorsey* received an aggregate sentence

of 76 years' imprisonment but, like defendant here, he was eligible for the day-for-day credit. *Id.* ¶¶ 50-51. The court noted that *Buffer* is a "fundamentally different" case because the sentencing scheme utilized in *Buffer* provided no opportunity for good-conduct credit. *Id.* ¶ 64. Therefore, "the more-than-40-years mark in *Buffer* is meant to be the line for a *de facto* life sentence where there is no opportunity to demonstrate rehabilitation and obtain release short of serving more than 40 years in prison." *Id.*

¶ 31    Unlike the sentencing scheme in *Buffer*, the day-for-day credit scheme requires that defendant receive day-for-day good conduct credit and each day of credit must " 'reduce by one day' " defendant's sentence imposed by the court. *Id.* ¶ 51 (quoting 730 ILCS 5/3-6-3(a)(2) (West 1994)). The court reasoned that this statutory credit scheme provides defendants with an opportunity for early release through their own actions. *Id.* ¶ 52. By conforming their conduct to prison rules, defendants "can demonstrate growth and rehabilitation" and obtain release after serving half of their sentence. *Id.* Although the defendant may not receive all of the credit available, it is entirely within his power to shorten his sentence by demonstrating maturity and rehabilitation. *Id.* ¶¶ 53-54. There is no constitutional requirement that a juvenile defendant be guaranteed release from prison before serving a life sentence. See *id.* For eighth amendment purposes, what matters is that the defendant have an opportunity to earn a second chance at liberty. *Id.* ¶ 53.

¶ 32    The court concluded that the day-for-day credit scheme allows the defendant " 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation' before he spends more than 40 years in prison." *Id.* ¶ 65. This opportunity for release "short of a *de facto* life sentence" is "on par with discretionary parole for a life sentence," a sentencing scheme that "pass[es] muster under the eighth amendment." *Id.* ¶ 54 (citing *Montgomery v. Louisiana*, 577

U.S. 190, 212 (2016)). Accordingly, the supreme court held that the defendant's 76-year sentence, "which offers an opportunity for release after serving 38 years in prison, was not a *de facto* life sentence in violation of the eighth amendment." *Id.* ¶ 65.

¶ 33     *Dorsey* made clear that *Miller*'s constitutional concerns pertain to the *statutory scheme* under which a juvenile defendant was sentenced, and not to the sentence he or she may end up serving. See *id.* ¶ 58. When a defendant is eligible for day-for-day good credit, "the governing factors *** are defendant's sentence and the laws surrounding good-conduct credit toward that sentence. *** No additional fact finding is necessary ***." *Id.* We therefore disagree with the dissent's argument that defendant's receipt of a demerit after his incarceration is relevant to the *de facto* life sentence calculation.

¶ 34     Like the defendant in *Dorsey*, defendant here is entitled to the day-for-day sentence credit. As such, the earliest opportunity he has to obtain release is after serving 40 years of his 80-year sentence, short of a *de facto* life sentence. See *id.* ¶ 54 (noting that the supreme court considers "the juvenile defendants' earliest opportunity for release in assessing whether a *de facto* life sentence had been imposed"). Following *Dorsey*, as we must, we find that defendant's 80-year sentence was not a *de facto* life sentence in violation of the eighth amendment.

¶ 35     Defendant argues that even if we follow *Dorsey*, his sentence exceeds the *Buffer* line because his three-year period of mandatory supervised release (MSR), to be served after he completes his sentence, should be considered part of his sentence. He contends that he is still serving his sentence during the MSR period because the Department of Corrections (DOC) "retains custody" of him, citing *People v. Correa*, 108 Ill. 2d 541 (1985), as support. The issue in *Correa* was whether the defendant could file a postconviction petition under the Post-Conviction Hearing

Act after he completed his sentence, but while he was on MSR. The court found that the MSR term was part of the defendant's sentence and, during the MSR period, the defendant remained in DOC custody. *Id.* at 546. Therefore, he was still serving his sentence while on MSR and was entitled to seek relief under the Act. *Id.* at 547.

¶ 36 We agree that under Illinois law, defendants on MSR remain in DOC custody and are under sentence. See *Holly v. Montes*, 231 Ill. 2d 153, 165-66 (2008). We do not agree that, as a result, defendant's MSR term must be added to his court-imposed prison sentence when determining whether he received a *de facto* life sentence under *Buffer*. Although defendant remains in DOC custody while on MSR, that does not mean he remains imprisoned. See *id.* at 166 (noting that MSR "home confinement is not the equivalent of incarceration in the penitentiary"). The concern in *Miller* and *Buffer* was the lifetime *imprisonment* of juvenile offenders with no opportunity to obtain release based on demonstrated maturity and rehabilitation. See *Buffer*, 2019 IL 122327, ¶¶ 20-21.

¶ 37 Furthermore, the supreme court in *Buffer* was aware of the defendant's "aggregate sentence of 50 years, followed by 3 years of mandatory supervised release." *Id.* ¶ 5. Throughout its opinion, however, the court referred only to the defendant's court-imposed prison term in its discussion of a *de facto* life sentence. See *id.* ¶ 40 ("In determining when a juvenile defendant's prison term is long enough to be considered *de facto* life without parole, we choose to draw a line at 40 years."); *Id.* ¶ 41 ("a prison sentence of 40 years or less" provides some opportunity for juvenile defendants to obtain release based on maturity and rehabilitation). Most telling is following:

"In the case at bar, defendant committed an offense, at age 16, that subjected him to a legislatively mandated minimum sentence of 45 years and for which he received a

sentence of 50 years. Because defendant's sentence was greater than 40 years, we conclude

that defendant received a *de facto* life sentence." *Id.* ¶ 42.

Our supreme court in *Buffer* knew of the defendant's MSR term following his 50-year sentence,

but clearly excluded it when determining whether he had received a *de facto* life sentence.

¶ 38    Pursuant to *Dorsey*, defendant can obtain release after serving 40 years of his sentence.

Our supreme court has determined that "a prison sentence of 40 years or less" is not a *de facto* life

sentence because it provides some meaningful opportunity for a juvenile defendant "to obtain

release based on demonstrated maturity and rehabilitation." (Internal quotation marks omitted.) *Id.*

¶ 41. Even if we consider defendant to be a juvenile, as he contends, a *Miller*-based claim requires

that he had received a "a life sentence, mandatory or discretionary, natural or *de facto*." *Id.* ¶ 27.

Accordingly, his postconviction sentencing claim based on *Miller*'s protections cannot stand. See

*People v. Hilliard*, 2021 IL App (1st) 200112, ¶ 31 (declining "to extend *Miller* to sentences of

less than natural or *de facto* life imprisonment").

¶ 39    Defendant, however, asserts that dismissal of his petition was premature where he had no

opportunity to develop facts supporting his proportionate penalties claim before the circuit court.

He argues that he should have the opportunity to do so in a postconviction proceeding, citing

*People v. Harris*, 2018 IL 121932, as support.

¶ 40    In *Harris*, the 18-year-old defendant was convicted of first degree murder and other

offenses and sentenced to a mandatory aggregate sentence of 76 years' imprisonment. *Id.* ¶ 16.

The defendant argued that the reasoning of *Miller* should be extended to him as a young adult, and

in doing so, the mandatory sentencing scheme as applied to him violates the proportionate penalties

clause. *Id.* ¶¶ 36-37. He maintained that the underlying record contained "sufficient information

about his personal history to allow the court to consider whether the evolving science on juvenile maturity and brain development relied upon in *Miller* applies to him." *Id.* ¶ 42.

¶ 41    Our supreme court disagreed. It found that the record contained only "basic information" on the defendant, primarily taken from the presentence investigation report. *Id.* ¶ 46. The trial court did not hold an evidentiary hearing on the issue, nor did it make findings on how the evolving science on juvenile brain development applies to the defendant's specific facts and circumstances. *Id.* Therefore, it found defendant's proportionate penalties contention "premature." *Id.* The court also stated that the defendant's claim was "more appropriately raised" in a postconviction proceeding. *Id.* ¶ 48.

¶ 42    In the recent case of *People v. House*, 2021 IL 125124, our supreme court reaffirmed its holding in *Harris*. In *House*, the 19-year-old defendant was sentenced to a mandatory natural life imprisonment term for the abduction and shooting deaths of two people, based on a theory of accountability. *Id.* ¶ 5. The defendant filed a postconviction petition alleging, in part, that his mandatory sentence of natural life in prison violated the proportionate penalties clause of the Illinois Constitution. *Id.* ¶ 7. The appellate court affirmed the dismissal of the other claims but vacated the defendant's sentence after finding that it shocked the moral sense of the community. *Id.* ¶¶ 9-10. After both parties appealed, the supreme court issued a supervisory order directing the appellate court to vacate its judgment and reconsider the effect of *Harris* on the proportionate penalties issue. *Id.* ¶ 11. On remand, the appellate court denied the parties' agreed motion to remand the cause for a second-stage evidentiary hearing and again vacated the defendant's sentence. *Id.* ¶ 12.

¶ 43    The State appealed to the supreme court as a matter of right. *Id.* ¶ 13. The supreme court reiterated its statement in *Harris* that "as-applied constitutional challenges are dependent on the specific facts and circumstances of the challenging party," and as a result, the record must " 'be sufficiently developed in terms of those facts and circumstances for purposes of appellate review.' " (Internal quotation marks omitted.) *Id.* ¶ 27 (quoting *Harris*, 2018 IL 121932, ¶ 39). The court found that

> "as in *Harris*, [the defendant] did not provide or cite any evidence relating to how the evolving science on juvenile maturity and brain development applies to his specific facts and circumstances. As a result, no evidentiary hearing was held, and the trial court made no factual findings critical to determining whether the science *** applies equally to young adults, or to [the defendant] specifically, as he argued in the appellate court." *Id.* ¶ 29.

Our supreme court noted that the appellate court's opinion "relied on articles from a newspaper and an advocacy group." *Id.* However, the circuit court made no "factual findings concerning the scientific research cited in the articles, the limits of that research, or the competing scientific research, let alone how that research applies to petitioner's characteristics and circumstances." *Id.* Citing *Harris*, the court concluded that the appellate court erred in finding that the defendant's sentence of natural life violated the proportionate penalties clause as applied to him. *Id.* ¶ 31. The cause was remanded to the circuit court for second-stage postconviction proceedings. *Id.* ¶ 32.

¶ 44    Although defendant here cites *Harris* and *House* as support for his argument, there is a significant distinction regarding those defendants: they received sentences of life imprisonment. Other cases defendant cites on the issue—including *People v. Minniefield*, 2020 IL App (1st) 170541, *People v. Daniels*, 2020 IL App (1st) 171738, and *People v. Johnson*, 2020 IL App (1st)

171362—also involved young adult defendants who sought to challenge their natural or *de facto* life sentences under the proportionate penalties clause.[1] The fact that these defendants received life sentences and, thus, had no meaningful opportunity to obtain release was crucial to the findings in those cases. Here, defendant did not receive a life sentence, *de facto* or otherwise.

¶ 45 Defendant argues that his petition should be considered, nonetheless, because his sentence was right on the 40-year line and if it had been only one day longer, it would have fallen within *Buffer*'s *de facto* life sentence boundary. He questions whether *Buffer*'s 40-year line should even apply to him as a young adult because *Buffer* was concerned with juvenile defendants and, as an offender "who [was] older at the time of arrest," he "suffer[s] the risk of geriatric release after a shorter-term."

¶ 46 The prospect of a defendant's "geriatric release," however, was not the primary consideration of our supreme court when it set the 40-year line. The *Buffer* court deliberately chose not to calculate an age based on statistics or actuarial tables because it recognized the breadth of disagreement as to what constitutes a *de facto* life sentence. See *Buffer*, 2019 IL 122327, ¶¶ 31-33. But the court also knew that it had to draw a line for determining such a sentence, finding that clarity and uniformity are " 'especially desirable' " when applying the eighth amendment to sentencing claims. *Id.* ¶ 29 (quoting *Roper*, 543 U.S. at 594 (O'Connor, J., dissenting)). The court

---

[1]Defendant also cites *People v. Ruiz*, 2020 IL App (1st) 163145, in which the defendant, who was 18 years old when the murder occurred, claimed he was entitled to the same sentencing protections as juveniles. Although he was sentenced to 40 years, the *Ruiz* court found that the defendant was "not subject to *Buffer*'s 40-year floor" because he was a young adult and there is a qualitative difference in life expectancy between a 15-year-old who receives a 40-year sentence and an 18-year-old who receives a 40-year sentence. *Id.* ¶ 44. However, for the reasons set forth in our opinion, we decline to follow *Ruiz* on this issue and choose to apply *Buffer*'s 40-year line to an 18-year-old defendant who claims that his or her sentence violates *Miller*. See also *Hilliard*, 2021 IL App (1st) 200112, ¶ 40 (declining to follow the majority in *Ruiz* and agreeing with Justice Pierce's dissent that the defendant's 40-year sentence was not a *de facto* life sentence, even for juveniles, and, thus, "did not qualify for *Miller* type protections").

extrapolated the 40-year number from the legislature, the entity best suited to prescribe minimum and maximum terms of imprisonment. *Id.* ¶ 35. Within this context, the court concluded that a sentence of more than 40 years for juvenile defendants is a *de facto* life sentence. *Id.* ¶ 42.

¶ 47 Until we have further guidance from our supreme court, we adhere to *Buffer*'s 40-year line when determining whether a young adult defendant received a *de facto* life sentence that required the protections of *Miller*. To have one rule for juveniles and another for young adults who claim they are no different from juveniles would create a dissonance that is incompatible with *Buffer*'s goal of providing clear and predictable constitutional standards on the issue. Defendant can of course argue that his less-than-*de facto* life sentence is unconstitutional based on the particular facts of his case. This argument, however, is a straight-forward proportionate penalties claim that does not rely on *Miller*'s protections for juvenile defendants.

¶ 48 The proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. A sentence violates the proportionate penalties clause if it is "cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Miller*, 202 Ill. 2d 328, 338 (2002). Our supreme court has never defined what constitutes a cruel or degrading sentence that is "wholly disproportionate to the offense" because "as our society evolves, so too do our concepts of elemental decency and fairness which shape the 'moral sense' of the community." *Id.* at 339. To determine whether defendant's sentence is disproportionate, "[w]e review the gravity of the defendant's offense in connection with the severity of the statutorily mandated sentence within our community's evolving standard of decency." *Id.* at 340.

¶ 49     The evidence presented at trial showed that the victim, Grover, was arguing with a member of defendant's gang, and defendant ran to Grover's apartment with a shotgun, held the gun to Grover's head, and shot him. The trial court sentenced defendant, who was a legal adult at the time of the murder, to an extended term of 80 years "because of the particularly brutal and heinous nature of this offense. This offense could be characterized as a cold-blooded assassination of the victim in this manner." Since defendant qualifies for day-for-day sentence credit, he is required to serve at least 50 percent, or 40 years, of his sentence. Due to the violent nature of Grover's murder, defendant's sentence does not shock the moral sense of the community, especially when we consider that defendant could obtain release after serving 40 years.

¶ 50     Even if we accept defendant's contention that he is more similar to a juvenile, our legislature has determined that a minimum of 40 years' imprisonment is appropriate for juveniles who commit first degree murder. *Buffer*, 2019 IL 122327, ¶ 39 (referencing 730 ILCS 5/5-4.5-105(c) (West 2016)). The legislative body is "better equipped to gauge the seriousness of various offenses" and is particularly suited to prescribing the "nature, character and extent of the penalties for a particular criminal offense." (Internal quotation marks omitted.) *Id.* ¶ 35. As such, courts "generally defer to the legislature in the sentencing arena." *Id.* Based on facts appearing in the record, we find no merit to defendant's claim that his sentence was unconstitutional under the proportionate penalties clause.

¶ 51                                    IV. CONCLUSION

¶ 52     For the foregoing reasons, we affirm the circuit court's dismissal of defendant's postconviction petition as frivolous and patently without merit.

¶ 53     Affirmed.

¶ 54    JUSTICE ODEN JOHNSON, dissenting:

¶ 55    I respectfully disagree with the majority's decision in this case. Defendant raises two issues in this appeal from the summary dismissal of his *pro se* postconviction petition, namely: (1) whether his sentence constitutes an unconstitutional *de facto* life sentence and (2) whether his sentence was unconstitutional as applied to him under the proportionate penalties clause. In this case, defendant is serving a sentence of 80 years for the 1994 offense, concurrent to his sentences of 60 years and 7 years for the 1995 offenses. The majority holds that our supreme court's decision in the recent case of *People v. Dorsey*, 2021 IL 123010, dictates the conclusion that defendant's 80-year sentence, for which he is eligible for day-for-day credit, is not a *de facto* life sentence, since, presumably, defendant will be eligible for release after he has served 40 years of his sentence. Thus, the majority holds, the sentencing scheme satisfies the eight amendment and *People v. Buffer*, 2019 IL 122327. However, I submit that *Dorsey* does not answer the question in instances, such as presented here, when defendant has received tickets or other demerits for infraction of prison rules while incarcerated, which could presumably impact whether or not he receives the full amount of day-for-day credit or any such credit. The majority is silent on this issue in the present case. Although not specifically raised in defendant's petition, the record reflects that he has received a ticket since his incarceration. According to *Dorsey*, a defendant's eligibility for good conduct credit may be considered at the leave to file stage. *Dorsey*, 2021 IL 123010, ¶ 58. This defendant has already received a ticket for an infraction that could prohibit the award of day-for-day good conduct credit, thereby making his sentence, at a minimum, 40 years plus one day, in violation of *Buffer*. I believe that we must consider whether or not he is actually entitled to the full good conduct credit and whether or not, under these circumstances, his sentence

amounts to a *de facto* life sentence.

¶ 56    Further, the majority does not fully address defendant's arguments concerning violations of the proportionate penalties clause. I note that the supreme court did not reach the defendant's proportionate penalties argument in *Dorsey* because it found that the claims were forfeited and barred by *res judicata* on the basis of the particular facts of that case. *Id.* ¶ 69. There are no such barriers here. Although defendant attempted to raise his as-applied constitutional challenge in his direct appeal, this court declined to review such claim, finding it premature, and advised that such claim was more appropriate in a postconviction proceeding. However, his *pro se* petition was summarily dismissed without any consideration of his as-applied constitutional challenge, and the majority simply defers to the legislature's power to construct criminal penalties. I do not believe that this conclusion adequately addresses an as-applied constitutional challenge based on a defendant's assertion that the legislatively prescribed penalty is unfair to him specifically. I would therefore consider defendant's as-applied constitutional claim that his sentence violated the proportionate penalties clause and would find that he met the very low bar for raising such claim at this stage of the postconviction proceedings.

¶ 57    Here, as noted previously, defendant filed a *pro se* postconviction petition that was summarily dismissed at the first stage. At the first stage, the trial court evaluates the petition on its own without input from the parties. *People v. Thomas*, 2014 IL App (2d) 121001, ¶ 47. Any petition deemed frivolous or patently without merit must be dismissed. *Id.* A petition is considered frivolous or patently without merit where it has no arguable basis either in law or in fact in that it is "based on an indisputably meritless legal theory or fanciful factual allegations." *Id.* (citing *People v. Hodges*, 234 Ill. 2d 1, 16 (2009)). In the case of a constitutional claim, a *pro se* petitioner

is not required to allege facts supporting all elements. *Id.* ¶ 48. *Pro se* petitions must be given a liberal construction and are to be viewed with a lenient eye, allowing borderline cases to proceed. *Id.* Because a *pro se* petitioner is likely unaware of the precise legal basis for his claim, the threshold for survival is low. A *pro se* petitioner need only allege enough facts to make out a claim that is arguably constitutional for purposes of invoking the Post-Conviction Hearing Act. *Id.* We review *de novo* the dismissal of a postconviction petition at the first stage. *Id.*

¶ 58 The proportionate penalties clause embodies our evolving standard of decency. *People v. Savage*, 2020 IL App (1st) 173135, ¶ 64. Part of this evolving standard is the idea that deterrence may have little-to-no place in sentencing children. *People v. Meneses*, 2022 IL App (1st) 191247-B, ¶ 19; *People v. Haynie*, 2020 IL App (1st) 172511, ¶ 34; *People v. Morris*, 2017 IL App (1st) 141117, ¶ 33; *Miller v. Alabama*, 567 U.S. 460, 472 (2012).

¶ 59 A review of defendant's *pro se* petition reveals that he made the following arguments in support of his contention that his 80-year sentence violated the proportionate penalties clause as applied to him: (1) he was just 18 years old and still developing as a young man at the time of the offense, (2) that the proportionate penalties clause may be violated when an offender is 18 where, based on science and the defendant's individual circumstances, he demonstrates that he is sufficiently similar to juveniles such that the *Miller* protections should be applied, (3) our supreme court has indicated that scientific research on the neurological development of young adults over the age of 18 should be presented to the trial court at a postconviction evidentiary hearing to determine whether an "emerging adult" should be treated as a juvenile under *Miller*, and (4) his sentence fails to provide him with a real opportunity to demonstrate growth and maturity and seems more consistent with eliminating his utility as a citizen rather than restoring him to useful

citizenship. He also attached to his petition several documents demonstrating the neurological differences between young adult brains and adult brains that advocated affording young adults the same sentencing guidelines as those imposed on juvenile offenders. Defendant also included a mitigation report, dated March 7, 2016, which detailed specific circumstances and details of his life and upbringing that had a "deleterious effect on [his] formative years, subsequently shaping his personality and resulting in the current circumstances of his life."

¶ 60 The proportionate penalties clause provides greater protections than the eighth amendment does. *Meneses*, 2022 IL App (1st) 191247-B, ¶ 22; *Savage*, 2020 IL App (1st) 173135, ¶ 65. Under the broader protections of Illinois's proportionate penalties clause, I believe that defendant has met the low threshold at this stage to allege an arguable claim of disproportionality that is neither frivolous nor patently without merit. Accordingly, I would reverse and remand for second stage postconviction proceedings.

**No. 1-20-0463**

| | |
|---|---|
| **Cite as:** | *People v. Thompson*, 2022 IL App (1st) 200463 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 94-CR-26814-01; the Hon. Thomas Joseph Hennelly, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Jonathan Yeasting, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Hareena Meghani-Wakely, and Tasha-Marie Kelly, Assistant State's Attorneys, of counsel), for the People. |