2023 IL App (3d) 200127

Opinion filed April 26, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Kankakee County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-20-0127 Circuit No. 11-CF-642 |
| DANNIE L. KENDRICK JR., | ) ) ) | The Honorable Kathy S. Bradshaw Elliott, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HETTEL delivered the judgment of the court, with opinion.
Presiding Justice Holdridge and Justice McDade concurred in the judgment and opinion.

_____

**OPINION**

¶ 1 At the age of 19, defendant Dannie L. Kendrick Jr. was charged with murder (720 ILCS 5/9-1(a)(2), (3) (West 2010)) and armed robbery (*id.* § 18-2(a)(2)). Prior to trial, defendant sought to exclude evidence of certain statements he made to police. The trial court partially denied the motion, allowing the jury to hear statements defendant made about his prior criminal activity and parole status. The jury found defendant guilty. At defendant's sentencing hearing, an expert in developmental psychology testified that defendant was capable of rehabilitation primarily due to his age at the time of his offenses. After concluding that defendant lacked rehabilitative potential,

the trial court sentenced defendant to 60 years in prison. On appeal, defendant argues (1) the trial court erred in admitting other-crimes evidence, (2) his sentence is unconstitutional, and (3) the trial court erred in finding he lacked rehabilitative potential.

¶ 2                                I. BACKGROUND

¶ 3        On November 30, 2011, the State charged defendant, a 19-year-old, with first degree murder (*id.* § 9-1(a)(2), (3)), armed robbery (*id.* § 18-2(a)(2)), and unlawful possession of a weapon by a felon (*id.* § 24-1.1(a)). The indictment alleged that defendant shot and killed Joseph Buckner while robbing him.

¶ 4        Between 2013 and 2018, defendant filed five motions to quash his arrest and/or suppress statements he made to police. Following hearings on each motion, the trial court denied them. In May 2019, defendant filed a motion *in limine* seeking to have various statements redacted from his interviews with police. The trial court partially granted and partially denied the motion, ordering some statements redacted but allowing statements defendant made about breaking into people's homes and being on parole to be admitted into evidence and heard by the jury. Defendant filed a motion to sever the unlawful possession of a weapon charge from the other charges against him. The trial court granted that motion, and the case proceeded to a jury trial on the murder and armed robbery charges.

¶ 5        Defendant's trial took place over six days. The evidence at trial established that the victim, Joseph Buckner, lived on the 600 block of South Lincoln Avenue in Kankakee. On November 25, 2011, Buckner was shot several times in front of his house between 7:50 p.m. and 7:52 p.m. Police found Buckner lying face down on the sidewalk about two blocks from his home with gunshot wounds to his chest, thigh, and thumb. Buckner died as a result of those gunshot wounds. The police found five .380-caliber shell casings in front of Buckner's house.

2

¶ 6　　　　Four days after Buckner's murder, three officers from the Kankakee Police Department interviewed defendant. Sergeant Steven Hunter interviewed defendant first. During that interview, defendant denied any involvement in Buckner's murder. Next, Detective Avery Ivey interviewed defendant, and defendant continued to deny killing Buckner. During that interview, defendant made the following statement:

"I break into people's houses, I ain't going to lie. I break into somebody's house. I won't shoot nobody. I won't kill nobody. You know what I'm saying. That ain't what I do. You know what I'm saying. I would rather catch you gone and I can get away from it and I'm gone. You know what I'm saying."

Later, Detective Randy Hartman interviewed defendant. Defendant initially denied his involvement in Buckner's murder but eventually admitted that he shot Buckner.

¶ 7　　　　Defendant told Hartman his cousin, Ricky Kendrick (Ricky), came up with the idea to rob Buckner because Ricky knew Buckner had money. Ricky waited across the street while defendant committed the robbery. Defendant approached Buckner's car and told Buckner to get out of the vehicle and give him money. Buckner gave defendant $250 and then grabbed defendant's gun. Defendant shot Buckner in the leg, and Buckner grabbed the gun again, so defendant shot him several more times, hitting him in the abdomen. Defendant ran toward his uncle's house, and Buckner ran in the opposite direction. Defendant said the gun he used was a .380-caliber that belonged to his cousin David Kendrick (David). Defendant told Hartman he did not intend to kill Buckner and only used the gun as a "scare tactic."

¶ 8　　　　Defendant told Hartman that he and Ricky had broken into houses on "random streets" in the past but this was his first time "ever shooting a person ever killing a person." Defendant also

3

mentioned to Hartman that he has a parole officer. The video recordings of Ivey's and Hartman's interviews with defendant were admitted into evidence and played for the jury.

¶ 9     Ricky Kendrick testified that the State initially charged him with Buckner's murder, but he pled guilty to armed robbery, and the State dismissed the murder charge against him. Ricky testified that on the night of November 25, 2011, he was with defendant. He had a .45-caliber pistol, and defendant had a .380-caliber pistol. He and defendant planned to burglarize a specific house that night but then decided not to. As they were walking, Ricky saw Buckner exiting his vehicle. Defendant told Ricky he wanted to rob Buckner. Ricky told defendant not to because Ricky knew and "loved" Buckner. Ricky walked across the street while defendant walked toward Buckner's car. Ricky heard defendant tell Buckner to "get the f*** out the car." Ricky then heard approximately five gunshots and ran toward his mother's house. Defendant caught up to Ricky and told him he shot Buckner because he reached for his gun.

¶ 10    Issaclerome Watson testified he has been a barber in Kankakee for many years and has cut defendant's hair several times. On November 25, 2011, Watson received a phone call from David at 8:04 pm asking him to cut defendant's hair. Watson agreed, and defendant arrived at his barber shop around 8:20 pm.

¶ 11    Dr. Melissa Russano, an expert in social cognitive psychology and investigative interviewing, interrogations, and confessions, testified that false confessions are not uncommon and that individuals under 21 years of age account for 49% of false confessions. She reviewed defendant's confession and saw significant known risk factors that increased the likelihood of a false confession, including the defendant's age, investigator tunnel vision, investigators lying or bluffing about evidence, investigators implying leniency or harsher punishment, and isolation.

4

¶ 12        Defendant's uncle, Andre Beals, testified that defendant was at his house the evening of November 25, 2011, until about 6 p.m. or 7 pm, when he left with Megail Waters. Ricky and David left an hour or two after defendant.

¶ 13        The jury found defendant guilty of murder and armed robbery. Defendant's presentence investigation report revealed that as a juvenile defendant was adjudicated delinquent for resisting a peace officer and criminal trespass to a residence. As an adult, defendant was convicted of unlawful possession of a controlled substance and resisting a peace officer. Defendant did not have a consistent and stable home as a child, living at various times with his mother, father, aunt, and grandmother. He also lived at a shelter, a foster home, and detention centers. His mother struggled with alcoholism, housing issues, and schizophrenia. The Illinois Department of Children and Family Service (DCFS) was involved in defendant's life at the age of three for abuse and neglect. His father was frequently incarcerated. Both his father and aunt were abusive to defendant. Defendant began selling crack and using marijuana at age 13. Defendant had a history of leaving substance-abuse facilities before completing treatment.

¶ 14        On February 21, 2020, the court held a sentencing hearing. Dr. James Garbarino, an expert in developmental psychology, testified that he interviewed defendant once for approximately two hours. Based on that interview, Garbarino determined that throughout his childhood and until the time of his crime, defendant "was dealing with major issues of adversity which are known to undermine positive development and increase the likelihood of a variety of problems, including violent behavior." According to Garbarino, research shows that "adversity slows down the development of [the] brain." In addition, defendant experienced significant "psychological maltreatment which creates emotional issues and behavioral issues that can disrupt normal adolescent development." Garbarino believed defendant's adversity and psychological

5

maltreatment undermined his ability to think clearly and clouded his ability to have positive social interactions with others.

¶ 15    In Garbarino's experience, almost all youthful offenders are capable of rehabilitation because the brain is not fully developed until age 25. Garbarino determined defendant's likelihood of rehabilitation was "very, very encouraging" based on his actions while in jail, including becoming an avid reader and committing to medication. According to Garbarino, those actions show defendant is engaging in positive behavior, "rather than just sitting around, or getting in trouble, or self-defeating behavior." Garbarino opined that if given additional resources, which are available in prison, defendant "will continue to flourish and will—will undergo this process of full rehabilitation and transformation." Based on his interactions with defendant, Garbarino concluded that defendant's "rehabilitation potential will continue to progress" and that defendant is "a good candidate for rehabilitation and potential release in his lifetime."

¶ 16    Garbarino discussed the principles set out in *Miller v. Alabama*, 567 U.S. 460, 469 (2012), and opined that they should be applied to young adults, not just juveniles. He testified:

> "[N]ow clearly the movement around the country is to bring the sentencing in—
> into closer approximation to what the science told them then and should tell them
> now, and that is that 18 is an artificial limit. So, for example, in California they
> have instructed—the legislation instructs parole boards to apply these principles up
> to age 23."

¶ 17    Defendant testified that he matured during the eight years he spent in jail and that meditation has enabled him to better address his problems. He stated he has better control of his emotions and is better at dealing with stress and anger. He had read more than 2000 books in jail.

He believes he can be a positive influence in the world and wants to be a social worker to help stop others from "destroying their own life or somebody else's."

¶ 18        The trial court then summarized the evidence, noting that "defendant was 19 years of age when this murder occurred" and that defendant was "the only shooter." The court stated:

> "Dr. Garbarino testified, however, we're in Illinois. We're not in Florida. And he's a developmental researcher, a clinical psychologist. And I can appreciate that, but the evidence is what it is in this case."

The court acknowledged that different sentencing rules apply to juveniles, referencing *People v. Buffer*, 2019 IL 122327, and *People v. Lopez*, 2019 IL App (3d) 170798. The court stated it "look[ed] at all the evidence in mitigation and aggravation." In aggravation, the court mentioned defendant's criminal history and that he "walked away" from drug rehabilitation treatment "many times." With respect to defendant's potential for rehabilitation, the court stated: "[W]hen I look at your rehabilitation, the likelihood of that, I do not find it great." The court entered an order sentencing defendant to 60 years in prison for first degree murder, followed by 3 years of mandatory supervised release.

¶ 19        Defendant filed a motion to reconsider his sentence, arguing that it was excessive and that the court erred by failing to consider the mitigating factors of youth addressed in *Miller*, such as his difficult childhood and his potential for rehabilitation. At the hearing on the motion, the court stated that it "looked at [defendant's] age, which was 19." The court also stated that it "looked at the rehabilitative potential" and concluded: "I do not see the potential for rehabilitation." The court mentioned aggravating factors, including defendant's criminal record and his lack of remorse. The court noted that because defendant was 19 years old at the time of the offense, "he actually doesn't fall under *Miller*." The court denied defendant's motion to reconsider.

¶ 20                                    II. ANALYSIS

¶ 21                              A. Other-Crimes Evidence

¶ 22       Defendant first argues that the trial court erred in denying his motion *in limine* to redact incriminating other-crimes evidence from his videotaped statements to police. He contends that it was improper for the jury to hear his statements about robbing houses in the past and having a parole officer.

¶ 23       "Evidence that a defendant has committed crimes other than the one for which he is on trial may not be admitted for the purpose of demonstrating his propensity to commit crimes." *People v. Adkins*, 239 Ill. 2d 1, 22-23 (2010). "Such evidence, however, may be admitted for a proper purpose such as proving *modus operandi*, intent, identity, motive, or absence of mistake." *Id.* at 23.

¶ 24       The admissibility of evidence is a matter within the sound discretion of the trial court, and the court's decision will not be disturbed absent a clear abuse of that discretion. *Id.* The erroneous admission of other-crimes evidence requires reversal "only if the evidence was 'a material factor in the defendant's conviction such that, without the evidence, the verdict likely would have been different.' " *Id.* (quoting *People v. Hall*, 194 Ill. 2d 305, 339 (2000)). If the erroneous admission of other-crimes evidence was unlikely to have influenced the jury, reversal is not warranted. *People v. Foreman*, 2019 IL App (3d) 160334, ¶ 31. Where there is overwhelming evidence of the defendant's guilt, the improper admission of other crimes evidence is harmless. See *People v. Gonzalez*, 379 Ill. App. 3d 941, 951 (2008).

¶ 25       Here, the State contends defendant's statements regarding his prior criminal activity were admissible to show defendant's motive. "[P]roof of other crimes is admissible to establish motive." *People v. Johnson*, 368 Ill. App. 3d 1146, 1157 (2006) (citing *People v. Coleman*, 158

8

Ill. 2d 319, 333 (1994), and *People v. Hale*, 326 Ill. App. 3d 455, 465 (2001)). However, no evidence of motive was necessary in this case in light of defendant's confession and Ricky's testimony. In his statement to Detective Hartman, defendant admitted that he shot Buckner in the course of a robbery. Ricky's testimony corroborated that defendant shot Buckner while robbing him. Thus, there was no need for the State to admit evidence that defendant had robbed homes on prior occasions or was on parole to establish defendant's intent to rob Buckner.

¶ 26    Nevertheless, the admission of the other-crimes evidence was harmless because the evidence against defendant was overwhelming. Defendant admitted in his videotaped statement to Hartman that he robbed Buckner and shot him because Buckner grabbed his gun. Ricky's testimony was consistent with defendant's videotaped statement. Ricky testified that defendant walked to Buckner's car and told Buckner to "get the f*** out the car." After that, Ricky heard approximately five gunshots and ran. Defendant told Ricky he had to shoot Buckner because he reached for his gun. Based on the overwhelming evidence against defendant, the trial court's erroneous admission of other crimes evidence was unlikely to have influenced the jury; thus, we will not reverse defendant's conviction on that basis. See *Foreman*, 2019 IL App (3d) 160334, ¶ 31; *Gonzalez*, 379 Ill. App. 3d at 951.

¶ 27                                B. Constitutionality of Defendant's Sentence

¶ 28    Defendant argues that his 60-year prison sentence violates the proportionate penalties clause of the Illinois Constitution both on its face and as applied to him because he was 19 years old at the time of his crimes.

¶ 29                                1. *Miller* and Its Progeny

9

¶ 30    While defendant does not raise an eighth amendment claim, a review of eighth amendment jurisprudence, particularly the United States Supreme Court's decision in *Miller*, 567 U.S. 460, helps explain defendant's proportionate penalties clause claim.

¶ 31    The eighth amendment of the United States Constitution prohibits "cruel and unusual punishments." U.S. Const., amend. VIII. "The Eighth Amendment's prohibition of cruel and unusual punishment 'guarantees individuals the right not to be subjected to excessive sanctions.' " *Miller*, 567 U.S. at 469 (quoting *Roper v. Simmons*, 543 U.S. 551, 560 (2005)). In *Miller*, the United States Supreme Court found that a mandatory sentence of life without parole for offenders under 18 years old "violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' " *Id.* at 465. The Supreme Court held that a sentencing court could impose a sentence of life without parole on a juvenile only if, prior to sentencing, the court considers factors relevant to youth and its attendant circumstances, including (1) the defendant's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences," (2) the defendant's "family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional," (3) the circumstances of the offense, "including the extent of his participation in the conduct and the way familial and peer pressures may have affected him," (4) "incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys," and (5) "the possibility of rehabilitation." *Id.* at 477-78.

¶ 32    *Miller* applies to both an actual sentence of life without parole and a "term of years that is the functional equivalent of life without the possibility of parole." See *People v. Reyes*, 2016 IL 119271, ¶ 9. A *de facto* life sentence, which is the functional equivalent of life without parole, is

more than 40 years. See *Buffer*, 2019 IL 122327, ¶¶ 40-41. *Miller* applies only to mandatory, not discretionary, *de facto* life sentences. *People v. Clark*, 2023 IL 127273, ¶ 72. Where a court has discretion to sentence the defendant to 40 years or less but imposes a sentence in excess of 40 years, *Miller* does not apply. *Id.*

¶ 33    Offenders who are 18 years old or older cannot challenge their sentences under the eighth amendment and the *Miller* line of cases. *People v. Harris*, 2018 IL 121932, ¶ 61. "As a result, Illinois courts typically consider the sentencing claims of young adults under the proportionate penalties clause [of the Illinois Constitution] rather than the eighth amendment." *People v. Jones*, 2021 IL App (1st) 180996, ¶ 14.

¶ 34    The proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. It "requires the balancing of the twin goals of retribution and rehabilitation, which requires a careful consideration of all the factors in aggravation and mitigation, including defendant's age and mental health." *People v. Savage*, 2020 IL App (1st) 173135, ¶ 64. "[T]he proportionate penalties clause goes further than the eighth amendment in offering protection against oppressive penalties." *Id.* ¶ 65.

¶ 35                    2. Legislation in Response to *Miller*

¶ 36    In February 2015, House Bill 2471 (99th Ill. Gen. Assem., House Bill 2471, 2015 Sess.) was introduced in the Illinois General Assembly and ultimately enacted as Public Act 99-69, adding section 5-4.5-105 to the Unified Code of Corrections (Unified Code). Pub. Act 99-69 (eff. Jan. 1, 2016) (adding 730 ILCS 5/5-4.5-105). "This statute provides a new sentencing scheme for defendants under the age of 18 when they committed their offenses." *Buffer*, 2019 IL 122327, ¶ 36. Before imposing any sentence, the sentencing court must consider several "additional factors in

11

mitigation in determining the appropriate sentence." 730 ILCS 5/5-4.5-105(a) (West 2020). The list of factors "is taken from and is consistent with *Miller*'s discussion of a juvenile defendant's youth and its attendant characteristics." *Buffer*, 2019 IL 122327, ¶ 36.

¶ 37     In January 2017, House Bill 531 (100th Ill. Gen. Assem., House Bill 531, 2017 Sess.) was introduced in the Illinois General Assembly and was enacted as Public Act 100-1182, adding section 5-4.5-110 to the Unified Code. Pub. Act 100-1182 (eff. June 1, 2019) (adding 730 ILCS 5/5-4.5-110); see Pub. Act 101-288 (eff. Jan. 1, 2020) (renumbering 730 ILCS 5/5-4.5-110 as 730 ILCS 5/5-4.5-115). This legislation was enacted in response to emerging case law to address "youthful offenders under the age of 21." *People v. Green*, 2022 IL App (1st) 200749, ¶ 41. Section 5-4.5-115 creates parole review for offenders under the age of 21 at the time of the offense. 730 ILCS 5/5-4.5-115(b) (West 2020). Under this statute, a person convicted of first degree murder is eligible for parole after serving 20 years if he was under 21 years old at the time of the offense and was sentenced after the law took effect. *Id.* In determining if a defendant should be granted parole, the Prisoner Review Board panel must "consider the diminished culpability of youthful offenders, the hallmark features of youth, and any subsequent growth and maturity of the youthful offender during incarceration." *Id.* § 5-4.5-115(j).

¶ 38     These statutes are "a remedial response to the constitutional issues recognized in *Miller* for both juveniles and young adults." *People v. Elliott*, 2022 IL App (1st) 192294, ¶ 56. By enacting these statutes, "[t]he legislature has taken significant steps in implementing *Miller* protections." *People v. Montanez*, 2022 IL App (1st) 191930, ¶ 59.

¶ 39                              3. Defendant's As-Applied Challenge

¶ 40     An as-applied constitutional challenge requires a showing that the statute violates the constitution as it applies to the facts and circumstances of the challenging party. *People v.*

12

*Thompson*, 2015 IL 118151, ¶ 36 (citing *People v. Garvin*, 219 Ill. 2d 104, 117 (2006)). A young adult, who is at least 18 but younger than 21 years of age, may rely on the evolving science regarding brain development to support an as-applied challenge to a life sentence under the proportionate penalties clause of the Illinois Constitution. *People v. Walker*, 2022 IL App (1st) 201151, ¶ 27 (citing *Thompson*, 2015 IL 118151, ¶¶ 43-44, and *Harris*, 2018 IL 121932, ¶¶ 59-61); *People v. Wilson*, 2022 IL App (1st) 192048, ¶ 87. *Miller* and its progeny establish that a defendant raising a claim under the proportionate penalties clause must show that he (1) was under 21 years of age at the time of the offense, and (2) received a mandatory natural or *de facto* life prison sentence. See *Clark*, 2023 IL 127273, ¶¶ 72-73, 86-88; *People v. Hilliard*, 2021 IL App (1st) 200112, ¶ 25.

¶ 41        In assessing whether a *de facto* life sentence has been imposed, the court must consider the defendant's "earliest opportunity for release." *People v. Dorsey*, 2021 IL 123010, ¶ 54 (citing *Reyes*, 2016 IL 119271, ¶ 10, and *People v. Patterson*, 2014 IL 115102, ¶ 108). If a defendant has a meaningful opportunity to obtain release before serving more than 40 years in prison, he has not received a *de facto* life sentence. See *People v. Thompson*, 2022 IL App (1st) 200463, ¶¶ 44-47; *People v. Brakes*, 2021 IL App (1st) 181737, ¶¶ 34-38.

¶ 42        "While release is not promised, the opportunity for parole provides a meaningful opportunity for release." *People v. Beck*, 2021 IL App (5th) 200252, ¶ 22. Section 5-4.5-115(b) of the Unified Code "affords defendant[s] a meaningful opportunity for release based on [their] maturity and rehabilitation before a *de facto* life sentence of over 40 years' imprisonment." *Id.* ¶ 26. When section 5-4.5-115(b) of the Unified Code applies, the defendant's sentence is "not a *de facto* life sentence since [the defendant] is eligible for parole." *Elliott*, 2022 IL App (1st)

13

192294, ¶ 56. Thus, a defendant who is sentenced after June 1, 2019, may not raise an as-applied constitutional challenge to his sentence under the proportionate penalties clause. See *id.* ¶¶ 55-56.

¶ 43　　　　Here, the trial court sentenced defendant, who was 19 years old at the time of crimes, to 60 years in prison on February 21, 2020. The statutory minimum sentence in this case was 45 years: 20 years for the murder and 25 years for the mandatory firearm enhancement. See 730 ILCS 5/5-4.5-20 (West 2010) (providing a range of 20 to 60 years imprisonment for first degree murder); *id.* § 5-8-1(a)(1)(d)(iii) (providing a mandatory add-on of 25 years to natural life if the defendant discharges a firearm and causes "great bodily harm, permanent disability, permanent disfigurement, or death to another person"). Because the trial court was required to sentence defendant to a prison term of more than 40 years, defendant's sentence would have constituted a mandatory *de facto* life sentence under *Miller* if it had been imposed prior to June 1, 2019. See *Clark*, 2023 IL 127273, ¶ 72.However, defendant was sentenced after June 1, 2019, so he is eligible for parole review after serving 20 years of his prison term. See 730 ILCS 5/5-4.5-115(b) (West 2020). As such, defendant has a reasonable opportunity to obtain release well before serving more than 40 years in prison and, therefore, did not receive a *de facto* life sentence. See *Thompson*, 2022 IL App (1st) 200463, ¶ 44; *Elliott*, 2022 IL App (1st) 192294, ¶ 56; *Beck*, 2021 IL App (5th) 200252, ¶ 26; *Brakes*, 2021 IL App (1st) 181737, ¶ 38. Because defendant did not receive a *de facto* life sentence, he cannot establish that his sentence violates the proportionate penalties clause. See *Elliott*, 2022 IL App (1st) 192294, ¶ 56; *Hilliard*, 2021 IL App (1st) 200112, ¶ 25. Thus, defendant's as-applied constitutional challenge fails.

¶ 44　　　　　　　　　　4. Defendant's Facial Challenge

¶ 45　　　　"Where a statute or ordinance is constitutional as applied to a party, a facial challenge will also fail since there is necessarily at least one circumstance in which the statute or ordinance is

14

constitutional." *People v. Rodriguez*, 2018 IL App (1st) 141379-B, ¶ 87. If a court finds a sentence does not violate the proportionate penalties clause as applied to the defendant, it need not address the defendant's facial challenge. *Id.* Since we have found that defendant's as-applied challenge fails, we need not address his facial challenge. See *id.*

¶ 46                    C. Appropriateness of Defendant's Sentence

¶ 47       Finally, defendant argues that we should remand for resentencing because the trial court erred in finding he lacked rehabilitative potential. He contends the trial court was required to accept the testimony of his expert witness, Garbarino, who opined defendant was a good candidate for rehabilitation because the State failed to present any contradictory expert testimony.

¶ 48       "It is well settled that a trial judge's sentencing decisions are entitled to great deference and will not be altered on appeal absent an abuse of discretion." *People v. Jackson*, 375 Ill. App. 3d 796, 800 (2007). We are to grant such deference because the sentencing court "is in the best position to 'analyze the acts constituting the crime and a defendant's credibility, demeanor, general moral character, mentality, social environments, habits, age, and potential for rehabilitation.' " *People v. Tijerina*, 381 Ill. App. 3d 1024, 1039 (2008) (quoting *People v. Ramos*, 353 Ill. App. 3d 133, 137 (2004)). The sentencing court is also in the best position to "judge the credibility of the witnesses and the weight of the evidence at the sentencing hearing." *Ramos*, 353 Ill. App. 3d at 137.

¶ 49       "[I]t is presumed that the trial court considered all mitigating factors, including rehabilitative potential, and the burden is upon the defendant to show the contrary." *People v. Connery*, 296 Ill. App. 3d 384, 391 (1998). It is within the trial court's discretion to determine what significance to give to each aggravating and mitigating factor. *People v. Lampley*, 2011 IL App (1st) 090661-B, ¶ 40 (citing *People v. Saldivar*, 113 Ill. 2d 256, 272 (1986)). A reviewing

15

court must not substitute its judgment for that of the trial court simply because it would have weighed the factors differently. *Jackson*, 375 Ill. App. 3d at 800-01.

¶ 50     The seriousness of the crime is "the most important factor in determining an appropriate sentence." *People v. Decatur*, 2015 IL App (1st) 130231, ¶ 12. While rehabilitation potential is a factor in sentencing, the sentencing court is not required to give it greater weight than other factors, including the seriousness of the crime. See *Connery*, 296 Ill. App. 3d at 391-92; *People v. Babiarz*, 271 Ill. App. 3d 153, 164 (1995). Unless the sentence is grossly disproportionate to the nature of the offense committed, it should be affirmed. *Tijerina*, 381 Ill. App. 3d at 1039. In determining if a sentence is excessive, the reviewing court may consider the defendant's eligibility for parole. See *Elliott*, 2022 IL App (1st) 192294, ¶ 59.

¶ 51     "The purpose of the aggravation and mitigation phase of the sentencing hearing is to insure that the discretion of the sentencing authority is exercised in an informed manner, based upon the evidence at hand and not on extraneous influences; on reason not caprice." *People v. Boclair*, 129 Ill. 2d 458, 493 (1989). The credibility and weight to give unrebutted testimony of a party's expert at a sentencing hearing are determinations for the sentencing court as the trier of fact. *Id.* (citing *People v. Wright*, 111 Ill. 2d 128, 154 (1985)); *People v. Oaks*, 169 Ill. 2d 409, 467 (1996), *abrogated on other grounds by In re G.O.*, 191 Ill. 2d 37 (2000). The trial court may reject expert testimony regarding the presence of a mitigating factor even if it is unrebutted. See *Oaks*, 169 Ill. 2d at 467.

¶ 52     Here, a review of the record establishes that the trial court considered all mitigating and aggravating factors, including defendant's rehabilitative potential, and "look[ed] at all the evidence in mitigation and aggravation" when sentencing defendant. Mitigating evidence included Garbarino's testimony. Garbarino testified that defendant's potential for rehabilitation was good

16

because of his age when he committed his crimes; however, the trial court found defendant's criminal history, repeated failures to complete substance-abuse treatment, and lack of remorse made him unlikely to be rehabilitated. The trial court, which presided over defendant's case for over eight years, was in the best position to analyze defendant's potential for rehabilitation. See *Tijerina*, 381 Ill. App. 3d at 1039. The trial court was not required to accept Garbarino's opinion, based on one two-hour interview, that defendant was a good candidate for rehabilitation. See *Oaks*, 169 Ill. 2d at 467; see also *Boclair*, 129 Ill. 2d at 493 (it is for the trial court to determine the credibility and weight to give unrebutted expert testimony).

¶ 53    Additionally, the trial court was not required to weigh more heavily defendant's rehabilitation potential than any other mitigating or aggravating factor, including the seriousness of the crime. See *Connery*, 296 Ill. App. 3d at 391-92; *Babiarz*, 271 Ill. App. 3d at 164. Here, defendant intentionally shot a man several times in cold blood in front of his home, causing his death. The trial court noted that the evidence showed defendant was "the only shooter." Under these facts and circumstances, defendant's sentence of 60 years in prison is not grossly disproportionate to the nature of his offense. That defendant is eligible for parole review in 20 years further militates against finding his sentence is excessive. See *Elliott*, 2022 IL App (1st) 192294, ¶ 59. Accordingly, we affirm defendant's sentence.

¶ 54                              III. CONCLUSION

¶ 55    The judgment of the circuit court of Kankakee County is affirmed.

¶ 56    Affirmed.

## *People v. Kendrick*, 2023 IL App (3d) 200127

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kankakee County, No. 11-CF-642; the Hon. Kathy S. Bradshaw Elliot, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Karalis, and Dimitri Golfis, of State Appellate Defender's Office, of Ottawa, for appellant. |
| **Attorneys for Appellee:** | Jim Rowe, State's Attorney, of Kankakee (Patrick Delfino, Thomas D. Arado, and Korin I. Navarro, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |