NOTICE

Decision filed 06/16/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230028-UB

NO. 5-23-0028

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Shelby County. |
| | ) | |
| v. | ) | No. 21-CF-62 |
| | ) | |
| CHANCE J. EVANS, | ) | Honorable |
| | ) | Amanda S. Ade-Harlow, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Moore and Sholar concurred in the judgment.

**ORDER**

¶ 1  *Held*:  Defense counsel was not ineffective for failing to argue for a Class 1 sentencing scheme for the offense of attempt first degree murder. A 26-year sentence does not violate the Illinois proportionate penalties clause.

¶ 2  Following a bench trial, the defendant, Chance J. Evans, was convicted of attempt first degree murder and aggravated unlawful use of a weapon. He was sentenced to 26 years in the Illinois Department of Corrections (IDOC) and 3 years' mandatory supervised release (MSR). On appeal, the defendant claims that defense counsel was ineffective for failing to argue for a Class 1 sentencing scheme for attempt first degree murder pursuant to section 8-4(c)(1)(E) of the Criminal Code of 2012 (720 ILCS 5/8-4(c)(1)(E) (West 2020)). The defendant additionally claims that his sentence violated the Illinois proportionate penalties clause.

1

¶ 3    On August 13, 2024, this court issued its decision in *People v. Evans*, 2024 IL App (5th) 230028-U. On October 11, 2024, the State filed a petition for leave to appeal, asking the Illinois Supreme Court to address whether the defendant's response was disproportionate to the provocation that occurred during the incident that led to the firing of a single shot into the vehicle of another. On January 29, 2025, the Illinois Supreme Court denied the State's petition for leave to appeal and entered a supervisory order. The supervisory order vacated this court's judgment in the defendant's case and directed this court to consider the effect of the decision in *People v. Haynes*, 2024 IL 129795, "on the issue of whether trial counsel was ineffective for not seeking a sentence reduction under 720 ILCS 5/8-4(c)(1)(E) and determine if a different result is warranted." *People v. Evans*, No. 131135 (Ill. Jan. 29, 2025). For the following reasons, we affirm the defendant's sentence.

¶ 4                                   I. BACKGROUND

¶ 5    On April 12, 2021, Joshua Travis was traveling with Amanda Guthrie, and her two children. They stopped at a gas station and the defendant arrived in a separate vehicle driven by his girlfriend, Jenae Swindell. After the cars passed each other in the parking lot, Swindell turned her vehicle around, chased after, and caught up to Travis's vehicle. The two cars drove side-by-side, at a high rate of speed, and the defendant discharged a firearm in the direction of Travis's vehicle. A bullet hit the vehicle driven by Travis.

¶ 6    The defendant was charged by information with eight total counts, including two counts of attempt first degree murder (720 ILCS 5/8-4(a) (West 2020)), five counts of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2020)), and one count of aggravated unlawful use of a weapon (720 ILCS 5/24-1.6(a)(1), (c) (West 2020)).

¶ 7                                          A. Trial

¶ 8      The circuit court held a bench trial on November 7, 2022. The State proceeded on one count of attempt first degree murder (count I), three counts of aggravated discharge of a firearm (counts III, IV, and V), and one count of aggravated unlawful use of a weapon (count VIII). Both parties waived opening statements.

¶ 9      The four adults involved in the confrontation testified to the events surrounding the April 12, 2021, incident, as well as law enforcement and one bystander. Amanda Guthrie, Travis's girlfriend, testified first for the State. Guthrie testified to a "violent" interaction between Travis and the defendant that had occurred in early April of 2021, at a gas station parking lot in Effingham, Illinois. The defendant had confronted Travis and was "trying to take his shirt off. Throwing his hands up in the air, screaming, yelling." Guthrie told Travis that they needed to leave because her children were present, and they left. Nothing further transpired between the defendant and Travis on that date.

¶ 10     Approximately a week later, on April 12, 2021, Travis, Guthrie, and her two children were driving in Guthrie's white car on their way to go fishing. They stopped at a gas station in Stewardson, Illinois. As they were leaving the gas station, Guthrie noticed the defendant and Swindell in a black or purple color SUV. Travis drove Guthrie's white car around the back of the gas station as Swindell drove by in her SUV in the opposite direction. The defendant was in the passenger seat of the SUV "screaming" and "throwing his hands in the air." Guthrie could not understand the defendant because his car windows were raised.

¶ 11     Travis left the gas station in Guthrie's white car and turned left onto Mode Road. Approximately half a mile from the gas station, Travis accelerated to pass a silver SUV. Swindell's vehicle was following behind Travis and passed the silver SUV. Swindell's vehicle then

3

approached on the left side of Guthrie's car in the passing lane on the two-lane county road. The defendant, sitting in the passenger seat, was "screaming out the window" as Swindell's SUV was "a little bit ahead" of Guthrie's white car. Travis grabbed a milkshake and "chuck[ed] it" at Swindell's car. Guthrie believed that the milkshake struck Swindell's SUV, and when she looked towards the SUV, she noticed that the defendant was holding a small handgun. The defendant fired the gun, and Travis stopped the car. Swindell continued driving.

¶ 12    Guthrie immediately called the police. Travis told her, "It was a fake gun. Hang up with the cops. Don't call the cops. It was a fake gun." Guthrie ended the call, and they traveled on. They then met with Travis's sister at the Spillway Motel.

¶ 13    After they arrived at the motel, Guthrie found the bullet hole in the side of her white car. She called the police again and went to the police station alone. Travis stayed with her children at the motel. Guthrie provided a written statement to the police and the police collected the bullet from the car. Guthrie assisted the police identify the defendant on Facebook. Guthrie additionally testified that Travis did not have a gun that day.

¶ 14    Travis testified that he had experienced a hostile relationship with the defendant for years. Approximately five years prior, Travis and the defendant had a physically violent interaction. Travis additionally testified that he had an altercation with the defendant a couple months prior to the April 12 incident. The defendant had yelled at Travis at a gas station. Travis testified that he "had kids in that car that time, too, so I think we pulled off."

¶ 15    On April 12, 2021, Travis was driving Guthrie's white car, and they had stopped at a gas station. Guthrie noticed a black or purple SUV arrive at the gas station and she asked Travis if the passenger was the person from the recent gas station incident.

4

¶ 16   Travis drove around the back of the gas station, and the SUV was driving in the opposite direction. When the cars crossed paths, Travis testified, "I think he—we might have—he might have been yelling. I'm not really sure." Travis left the gas station and turned onto Mode Road, towards Shelbyville, Illinois. Swindell's SUV followed.

¶ 17   The SUV driven by Swindell caught up to Travis's vehicle and began driving in the passing lane next to Travis's vehicle. The vehicles were side-by-side, approximately three feet apart and traveling 70-80 miles per hour. While Travis was speeding next to Swindell, he threw a milkshake at her black SUV. Travis could not recall the defendant's demeanor before Travis threw the milkshake. Travis did not know if the defendant's window was down when the milkshake was thrown or where the milkshake landed. Travis additionally testified that the defendant pulled out his gun, pointed the gun at Travis, and the gun went off. Travis "slammed on the brakes," and Swindell's car continued driving onward.

¶ 18   On cross-examination, Travis testified that he had a pending charge in Effingham County for possession of a stolen firearm, a Ruger LC9 millimeter, as well as a pending charge for unlawful possession of weapons by a felon. Travis denied having a weapon in his possession on April 12, 2021. The police interviewed Travis that same day and they did not search for a weapon.

¶ 19   During Travis's cross-examination, the defendant requested to be handcuffed. The circuit court granted his request.

¶ 20   Travis's testimony resumed, and he testified that he heard a "pop" noise when he was driving 80 miles per hour, approximately three feet from the black SUV. Travis did not know how long the defendant held a gun out of the car window. He did not see the gun drop onto the road. Travis had mentioned to Guthrie that the gun may have been fake because he did not see a bullet hole when they stopped.

5

¶ 21    Kim Yarnell testified that she was driving on the day of the incident, and in her rearview mirror, approximately a quarter mile back, she noticed a black SUV and a white car driving side-by-side. Yarnell testified that "a drink was thrown, and it hit the side of the white car." Then, the passenger of the SUV "stuck" an arm straight out of the window and pointed towards the white car. The white car pulled over and stopped. The driver looked at the side of the car and the black SUV kept driving. Yarnell never saw a gun, and she did not hear a gunshot.

¶ 22    Swindell, the defendant's girlfriend, testified for the State. Swindell had pending charges against her for the April 12 incident. In exchange for truthful and complete testimony and pleading guilty to obstructing justice, the State agreed to dismiss additional charges filed against her in People v. Swindell, No. 21-CF-61 (Cir. Ct. Shelby County). Swindell agreed to time served of 180 days and to 2 years of probation.

¶ 23    Swindell testified that she owned a black Ford Edge SUV. A week before April 12, 2021, Swindell was with the defendant at a gas station in Effingham, Illinois. Travis had "said something" to the defendant when the defendant was walking into the gas station, causing Travis and the defendant to yell at each other. Travis then left.

¶ 24    On April 12, 2021, Swindell and the defendant pulled into the parking lot of a gas station in Stewardson, Illinois. Before reaching the gas pump, the defendant told Swindell to follow a white car. Travis and Guthrie were in the white car. She did not see any children. Swindell drove around the gas station and passed the white car on the side of the building. Travis and the defendant were yelling at each other.

¶ 25    Swindell continued to follow Travis's car after it turned left onto Mode Road. Swindell testified that Travis was driving slowly. She attempted to pass Travis's car, but Travis accelerated to match her speed, preventing her from passing. The cars were side-by-side for "a solid amount

6

of time." Travis and the defendant were yelling at each other while the windows were down. Travis's "head was out the window." Travis threw something that hit her SUV. The defendant then grabbed a gun from the middle console and fired in the direction of the white car.

¶ 26    Swindell testified that the defendant had purchased a black revolver from her cousin. The defendant had placed the gun in the center console of Swindell's SUV, and Swindell was not aware if the gun was loaded prior to the incident. Swindell did not see the defendant fire the gun, but she testified that the defendant's hands had been outside of the window.

¶ 27    The defendant dropped the gun on the side of the road. He wanted to go back to pick up the gun, but Swindell continued driving to the defendant's brother's house in Charleston, Illinois. Swindell called her mother and asked her to go find the gun. That evening, the defendant, his brother, and his brother's girlfriend drove to Swindell's mother's house, but they were unable to retrieve the gun. After they left Swindell's mother's house, they were pulled over by the police. The defendant had placed a box of bullets in the center console of Swindell's SUV earlier that day and the police collected that box of ammunition during the traffic stop.

¶ 28    Swindell did not see Travis with a firearm on the day of the incident. However, Travis had a history of bullying the defendant and had previously tried to intimidate the defendant by sending him photographs of firearms.

¶ 29    Swindell testified that she gave false statements to the police during her interviews. Swindell told the police and included in a written statement, that the defendant had accidentally fired the gun. Her written statement included that she had followed after Travis's car because she was angry that Travis had called them names at the gas station. Swindell decided to pass Travis's car, and Travis yelled at them as they passed by. Swindell had stated she believed Travis had a gun in his lap, so she picked up a gun from the center console to show Travis. Swindell was unable to

7

show Travis the gun and drive. Her statement said she repeatedly asked the defendant to take the gun, but the defendant did not want to show Travis the gun. The defendant eventually grabbed the gun and pointed it towards Travis's vehicle. Swindell claimed she was watching the defendant while she was driving, and she swerved onto the shoulder of the road, which had gravel and potholes, which caused the firearm to discharge. Swindell admitted to making the written statement and testified that her written statement was false.

¶ 30    Jeffery Wood, a patrol deputy with the Shelby County Sheriff's Office, testified that he interviewed Guthrie after she reported that her vehicle had been involved in a shooting. Wood examined the vehicle and retrieved a bullet from the A-pillar, the brace that extended from the main body of the car to the roof, on the front driver's side. The windshield was shattered in the direction from where the bullet entered indicating that the shot was fired "from in front of that vehicle back towards the driver compartment."

¶ 31    Wood spoke to Travis at the Spillway Motel. After leaving the motel, Wood went to Swindell's mother's home. Wood discovered a car, with passengers, was waiting outside of the house. He followed the vehicle, and the car failed to stop at a T-intersection. Wood stopped the vehicle, and the defendant was a passenger in the backseat of the car. The car was searched and a jewelry box containing 23 .38-caliber unspent bullets were located in the rear passenger seat area.

¶ 32    Wood interviewed the defendant at the Shelby County Detention Center. During the interview, the defendant stated that Travis had pointed a gun at the defendant, and Travis threw a slushie at their car. The defendant additionally stated that he had pointed a gun back at Travis's vehicle and fired one shot that struck somewhere near the tire. The defendant claimed that he felt threatened, and he was protecting himself and Swindell. The defendant provided a similar written

8

statement. Wood testified that the defendant did not claim that Swindell had handed him the gun or that she told him to display the gun to Travis. The State rested after Wood testified.

¶ 33    The defendant testified on his own behalf. The defendant described his relationship with Travis as "rocky." On April 12, 2021, Travis saw the defendant before Swindell was able to pump gas. Swindell drove around to the back of the gas station counterclockwise, and Travis drove clockwise. When the cars passed each other, Travis called the defendant a "b***" and the defendant responded by calling Travis a "b***." Travis also showed the defendant a firearm. The firearm was the size of the defendant's hand and "looked like a .22." The defendant further testified that the day before the incident, Travis had argued with the defendant at a different gas station and Travis had the same gun.

¶ 34    Swindell followed Travis's car as it made a left turn out of the gas station parking lot. There was a car in between their cars when Swindell left the gas station parking lot. Swindell reached into the center console for a gun and passed the car that was behind Travis's vehicle. The defendant testified that Swindell was driving approximately 80 miles per hour. While Swindell was driving next to Travis's vehicle, she was aiming a cocked gun past the defendant's face. The defendant was afraid of getting hurt and they argued over the cocked gun. The defendant "snatched" the gun from Swindell and "it ended up getting discharged out the window" after Travis threw a "blue slushie" at Swindell's car.

¶ 35    The defendant testified that he was not pointing the gun at anyone. Travis's car was behind Swindell's car when the gun accidentally discharged because of the bumpy road. The gun fired in the direction of Travis's front driver's tire. The defendant testified that he had an amputated finger; he was shocked when the gun discharged; and he dropped the gun after it went off. Travis's car stopped when the gun dropped.

9

¶ 36    The defendant denied loading the gun and was unaware that the gun was loaded when it was pointed out of the window. After the gun discharged, the defendant cried and apologized to Swindell. The defendant also yelled, "I'm sorry" towards Travis. The defendant testified that he did not see children in Travis's car, and he had not intentionally fired a gun in the direction of Travis.

¶ 37    On cross-examination, the defendant testified that when he was interviewed by the police on April 12, 2021, he was under the influence of drugs. He told the police officer that he was protecting Swindell and fired a shot from the handgun. The defendant read a portion of his written statement to the police which said, "I felt threatened. I was just trying to protect the woman I'm going to marry and include myself. I'm terribly sorry and will never pick up metal a day of my life. Also, after—when I seen his weapon, I shot it near his tire."

¶ 38    The State questioned why the defendant had requested to be handcuffed during the trial. The defendant explained that Travis was "flipping him off." The defendant stated that he was "getting worked up" but was not angry.

¶ 39    The defendant testified that the decision to follow Travis was Swindell's choice; she was the driver. The defendant did not want to follow Travis. When the cars crossed paths at the gas station, Travis started yelling and the defendant yelled back. The defendant further testified that he did not know anything about guns. He grabbed the gun from Swindell "because she was about to shoot it past [the defendant's] face" and the gun accidentally discharged.

¶ 40    At the conclusion of the defendant's testimony, the parties presented closing arguments. The State's closing argument posited that the defendant had the intent to kill because he had pointed and fired a gun at close range. Defense counsel argued that Travis's criminal history

indicated a propensity to have a gun and Travis had threatened the defendant with a gun in the past. Defense counsel additionally argued that the defendant accidentally discharged the firearm.

¶ 41 The circuit court found that the defendant had not offered any evidence in opposition to the charge of aggravated unlawful use of a weapon and found the defendant guilty of count VIII. The circuit court then addressed counts III, IV, and V for aggravated discharge of a firearm and found the defendant guilty of count IV, beyond a reasonable doubt. Because only one shot was fired, and there was one victim, the circuit court did not enter multiple convictions. The circuit court next addressed count I and found the defendant guilty of attempt first degree murder.

¶ 42 B. Sentencing Hearing

¶ 43 The circuit court held the defendant's sentencing hearing on January 5, 2023. Prior to the start of the sentencing hearing, the defense argued a motion for a new trial. The defense claimed that the firearm accidentally discharged; the State failed to prove that the defendant intentionally fired a shot and had intended to kill Travis; and the State failed to prove that the defendant knowingly discharged a firearm in the direction of Travis, Guthrie, or their vehicle. The defense additionally argued that the defendant was prejudiced by Travis making obscene gestures during his testimony. The State argued that based on the trajectory of the bullet it was clear that the defendant had aimed at Travis, and at no point prior to trial had the defendant claimed that the firearm accidentally discharged. The circuit court denied the motion for a new trial.

¶ 44 The State presented one witness in aggravation, Kaitlyn Gritzmacher, a correctional officer in Shelby County. The defendant had been placed on "lockdown" because of his behavior. The defendant also made a phone call where he mentioned "that he was ready to strangle [Kaitlyn] and break [her] neck and shove the glasses in [her] eyes." Kaitlyn testified that the other inmates frequently called the defendant racial slurs. The defendant never attempted to strangle Kaitlyn and

11

had never touched her, but he was not physically able to touch her when he was behind bars. The defendant's behavior improved as the trial date approached.

¶ 45    The defendant presented evidence in mitigation. Amanda Jenkins, a friend of the defendant's family, testified that she had known the defendant since he was born. The defendant lost part of a finger while he was working at a factory. After that incident, the defendant became depressed and suicidal.

¶ 46    The defendant's younger brother, Jaquese, testified that the defendant would frequently babysit his siblings when they were growing up. The defendant was involved in sports at school and encouraged Jaquese to participate in track and field. The defendant would also help their grandmother cook for his siblings.

¶ 47    Amanda Hopgood, the defendant's mother, testified that the defendant was a "good kid." He had issues with his mental health after his accident that resulted in an amputated finger. The defendant had a learning disability and required special accommodations during school. While the defendant was incarcerated, inmates used racial slurs and gave him a book that had white power, "Kill a n***," and "KKK" written on the book. The racial slurs distressed the defendant. He would vent to Hopgood during their phone calls, and Hopgood had heard the "N word" in the background during a phone call with the defendant. Hopgood testified that the defendant had not been in trouble before and did not deserve to be incarcerated for a period longer than he had been alive.

¶ 48    The State recommended that the defendant receive a sentence of 33 years in IDOC, which was close to the minimum sentence where the defendant did not have any prior felony convictions. The State argued factors in aggravation including that the defendant's behavior during the incident had threatened physical harm to children and their mother. The State additionally argued that the defendant was dangerous and had an explosive personality disorder. The State claimed that the

12

correctional officer, Kaitlyn, would have been attacked by the defendant if he were not behind bars.

¶ 49    Defense counsel argued for the minimum sentence of 26 years where the defendant did not have a criminal history of violence. The defendant suffered from post-traumatic stress disorder (PTSD) after his finger was amputated and was taking medication. Defense counsel additionally argued that the defendant was not involved in any physical alterations with a correctional guard or an inmate while he was incarcerated.

¶ 50    The defendant made a statement in allocution where he stated he would accept the consequences, and he requested the minimum sentence. He did not intend to harm anyone and was glad that no one was injured. The defendant also stated that he had a three-year-old daughter.

¶ 51    Guthrie made a statement that she frequently thought about the incident and had nightmares that the defendant shot her children. She requested that the defendant receive the maximum sentence.

¶ 52    The circuit court considered the presentence investigation report, the character and attitude of the defendant, evidence and arguments, the defendant's statement of allocution, and the statutory factors in aggravation and mitigation. The circuit court sentenced the defendant to the minimum sentence of 26 years in the IDOC, followed by 3 years of MSR on count I. The defendant was not sentenced on count IV, aggravated discharge, because count IV merged with count I. The circuit court sentenced the defendant to one year in the IDOC, followed by one year of MSR for count VIII, to run concurrently with count I. This appeal followed.

13

¶ 53                                    II. ANALYSIS

¶ 54    On appeal, the defendant challenges his sentence and does not dispute the sufficiency of

the evidence for the underlying convictions.[1] The defendant argues that defense counsel was

ineffective for failing to argue that the defendant's attempt murder sentence should have been

reduced to a Class 1 felony; the defendant further argues that a 26-year sentence in the IDOC,

imposed on an emerging adult, violates the proportionate penalties clause.

¶ 55    When determining whether a defendant was denied effective assistance of counsel, the

defendant must demonstrate that counsel's performance was deficient where it fell below an

objective standard of reasonableness, and the deficient performance prejudiced the defendant.

*Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Ineffective assistance of counsel during a

sentencing hearing occurs when "counsel's performance was below minimal professional

standards and *** a reasonable probability exists that the sentence was affected." *People v.

Orange*, 168 Ill. 2d 138, 168 (1995). Both prongs of the *Strickland* test must be satisfied by the

defendant for a finding of ineffectiveness. *People v. Veach*, 2017 IL 120649, ¶ 30. Ineffective

assistance of counsel claims are generally reviewed *de novo*. *People v. Gunn*, 2020 IL App (1st)

170542, ¶ 91.

¶ 56    For a conviction of attempt murder, the State is required to prove that the defendant had

taken a substantial step toward committing a murder, and the defendant had the criminal intent to

commit murder. *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 35. Generally, attempt to

commit first degree murder is sentenced as a Class X felony. 720 ILCS 5/8-4(c)(1)(E) (West 2022).

---

[1]On May 30, 2025, while this court was reconsidering its prior decision pursuant to the supervisory order, the defendant filed a "Motion To File Supplemental Brief Instanter To Address Attempt Murder Conviction In Light Of Illinois Supreme Court's Recent Decision in *People v. Guy*, 2025 IL 129967." The State objected and this court denied the defendant's motion.

¶ 57    If a person kills an individual without lawful justification under a "sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed," then the person would be charged with second degree murder. *People v. Banks*, 227 Ill. App. 3d 462, 472-73 (1992). Second degree murder is a Class 1 felony. 720 ILCS 5/9-2(d) (West 2022). The offense of attempt second degree murder does not exist. *People v. Lopez*, 166 Ill. 2d 441, 445-46 (1995).

¶ 58    The language in the sentencing provision of section 8-4(c)(1)(E) is substantially similar to the language used for second degree murder. Our supreme court recently reaffirmed the legal proposition that the phrase "serious provocation" in section 8-4(c)(1)(E) should be construed "in the same manner as the language in the second degree murder statute, upon which section 8-4(c)(1)(E) was based." *People v. Haynes*, 2024 IL 129795, ¶ 35.

¶ 59    Section 8-4(c)(1)(E) states,

> "if the defendant proves by a preponderance of the evidence at sentencing that, at the time of the attempted murder, he or she was acting under a sudden and intense passion resulting from serious provocation by the individual whom the defendant endeavored to kill, or another, and, had the individual the defendant endeavored to kill died, the defendant would have negligently or accidentally caused that death, then the sentence for the attempted murder is the sentence for a Class 1 felony." 720 ILCS 5/8-4(c)(1)(E) (West 2022).

¶ 60    "Serious provocation" is defined under second degree murder as "conduct sufficient to excite an intense passion in a reasonable person." 720 ILCS 5/9-2(b) (West 2022). The Illinois Supreme Court has recognized specific categories of serious provocation that are defined as, "substantial physical injury or assault, mutual quarrel or combat, illegal arrest, and adultery with the offender's spouse; but not mere words or gestures or trespass to property." (Internal quotation marks omitted.) *People v. Tenner*, 157 Ill. 2d 341, 371 (1993); *People v. Lauderdale*, 2012 IL App (1st) 100939, ¶ 24 (applying these four categories to the sentence reduction provision); *Haynes*,

15

2024 IL 129795, ¶ 36. A mutual quarrel or combat is "a fight or struggle which both parties enter willingly or where two persons, upon a sudden quarrel and in hot blood, mutually fight upon equal terms." *People v. Austin*, 133 Ill. 2d 118, 125 (1989). Mere words are not enough to establish sufficient provocation, and the conduct must be "sufficient to excite an intense passion in a reasonable person." *People v. Neal*, 112 Ill. App. 3d 964, 967 (1983). "The provocation must be proportionate to the manner in which the accused retaliated." *Neal*, 112 Ill. App. 3d at 968.

¶ 61    Recently, in *Haynes*, the Illinois Supreme Court reiterated its prior holdings that in situations involving "mutual combat," the person who instigates the combat cannot rely on the victim's response as evidence of mutual combat. *Haynes*, 2024 IL 129795, ¶ 40. Furthermore, "provocation by the victim must cause a passionate state of mind in an ordinary person under the same circumstances," such that a slight provocation is not enough, "because the provocation must be proportionate to the manner in which the accused retaliated" (internal quotation marks omitted). *Haynes*, 2024 IL 129795, ¶ 41. "Proportionality therefore remains a relevant consideration in determining whether mutual combat applies." *Haynes*, 2024 IL 129795, ¶ 46.

¶ 62    The defendant argues, on appeal, that one shot was accidentally fired in response to Travis's provocation through mutual quarrel and assault. The defendant testified that he had an ongoing feud with Travis. Within a relatively short period prior to the incident, Travis and the defendant had a "violent" confrontation and Travis had a .22 firearm during that prior incident. Additionally, Travis had testified that he had pending gun charges for possession of a stolen firearm and unlawful possession of a weapon by a felon.

¶ 63    The State argues that the mitigating provision of section 8-4(c)(1)(E) does not apply where the defendant had testified that his actions were accidental, and he lacked the intent to kill. The

State argues to the contrary that the very fact of firing a gun at a person supports the conclusion that the person doing so acted with the intent to kill.

¶ 64     Based upon the defendant's arguments, we find that during the April 12 incident, the defendant and Travis yelled at each other from their vehicles in a gas station parking lot. The defendant testified that Travis displayed the same weapon on April 12, 2021, as in the prior incident. The confrontation escalated beyond mere words. Swindell was the driver of her black SUV, and she followed Travis as he left the gas station, driving the white car. Swindell testified that when she attempted to pass Travis, he was the driver who sped up to prevent her from passing. Both vehicles were traveling on a two-lane county road. Swindell was in a lane with the possibility for oncoming traffic. Travis, the driver of his vehicle, and the defendant were yelling at each other within three feet of one another while the vehicles were traveling approximately 80 miles per hour. Travis threw a beverage at Swindell's SUV while the cars were side-by-side, and the defendant believed that Travis had a firearm. The defendant argues under one scenario that he was acting out of sudden and intense passion and reacted to the provocation by firing one shot from a firearm.

¶ 65     Defense counsel, however, did not raise the issue of whether the defendant's actions were the result of a serious provocation by Travis at the sentencing hearing. The defendant had testified that his gun accidentally discharged. The question of fact as to whether Travis had a gun pointed at the defendant during the incident was not determined by the circuit court. It is clear, however, that even if defense counsel chose to argue sudden provocation, the defendant was in the SUV which followed the car driven by Travis and was the aggressor in this situation. Defense counsel's failure to raise the issue of serious provocation did not fall below the objective standard of reasonableness, where the defendant's response to the situation was to fire a gun outside of the passenger window in the direction of the other car, which contained several people and which, by

17

all accounts, was traveling close by, parallel to the defendant's vehicle. Defense counsel could not have advocated that the defendant was engaged in "mutual combat" with Travis, as the circumstances did not rise to the level of "a sudden quarrel and in hot blood" that was on mutually equal terms. See *Haynes*, 2024 IL 129795, ¶ 40. And even if the circumstances could be determined as "mutual combat," the defendant's response of firing a gun in the direction of a car full of people was out of proportion for the circumstances. Thus, defense counsel's performance was not deficient for failing to make the argument that the defendant was acting under a sudden and intense passion resulting from serious provocation.

¶ 66 Therefore, we find that the defendant fails to demonstrate that defense counsel was ineffective at sentencing, and we affirm the sentence imposed by the circuit court.

¶ 67 The defendant additionally argues that the mandatory 20-year firearm enhancement violates Illinois's proportionate penalties clause as applied to him, based on the defendant's age at the time of the offense and the fact that he is capable of rehabilitation. The defendant did not raise this argument before the circuit court and seeks plain error review. " '[T]he plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence.' " *People v. Fort*, 2017 IL 118966, ¶ 18 (quoting *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)).

¶ 68 The Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. To be meritorious on a claim of a proportionate penalties clause violation, "a defendant must show either that the penalty imposed is cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community; or that it

differs from the penalty imposed for an offense containing the same elements." *People v. Klepper*, 234 Ill. 2d 337, 348 (2009). Whether a sentence violates the proportionate penalties clause is reviewed *de novo*. *People v. Cavazos*, 2023 IL App (2d) 220066, ¶ 63.

¶ 69     The defendant argues that the mandatory 20-years firearm enhancement is unconstitutional as applied to him based on his age where his sentence shocks the conscience of the community considering the evolving standards of decency related to sentencing young adult offenders. The defendant additionally argues that his learning disability lowers his functional age, and his mental health should be considered for the purpose of proportionate penalty review.

¶ 70     The United States Supreme Court found that a mandatory sentence of life without parole for offenders under 18 years old "violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' " *Miller v. Alabama*, 567 U.S. 460, 465 (2012). For sentencing purposes, juveniles are constitutionally different from adults. *Miller*, 567 U.S. at 471. Illinois enacted a statute for sentencing defendants under the age of 18 requiring the sentencing court to consider additional factors in mitigation. See 730 ILCS 5/5-4.5-105 (West 2022).

¶ 71     "[T]he proportionate penalties clause goes further than the eighth amendment in offering protection against oppressive penalties." (Internal quotation marks omitted.) *People v. Kendrick*, 2023 IL App (3d) 200127, ¶ 34. "A young adult, who is at least 18 but younger than 21 years of age, may rely on the evolving science regarding brain development to support an as-applied challenge to a life sentence under the proportionate penalties clause of the Illinois Constitution." *Kendrick*, 2023 IL App (3d) 200127, ¶ 40. Additionally, courts have repeatedly found statutes requiring the mandatory imposition of a firearm enhancement to be unconstitutional as applied to juvenile offenders under the proportionate penalties clause. See *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 4 (15-year-old defendant); *People v. Aikens*, 2016 IL App (1st) 133578, ¶ 17 (17-

19

year-old defendant); *People v. Barnes*, 2018 IL App (5th) 140378, ¶ 1 (17-year-old defendant); and *People v. Womack*, 2020 IL App (3d) 170208, ¶ 3 (16-year-old defendant).

¶ 72    We additionally consider that, " '[t]he legislature has the power to prescribe penalties for defined offenses, and that power necessarily includes the authority to prescribe mandatory sentences, even if such sentences restrict the judiciary's discretion in imposing sentences.' " *People v. Hilliard*, 2023 IL 128186, ¶ 21 (quoting *People v. Huddleston*, 212 Ill. 2d 107, 129 (2004)). "The legislature's determination of a particular punishment for a crime in and of itself is an expression of the general moral ideas of the people." *Hilliard*, 2023 IL 128186, ¶ 38. The mandatory firearm enhancement reflects the legislature's intent to deter the use of firearms in the commission of felonies. *People v. Sharpe*, 216 Ill. 2d 481, 525-26 (2005). The sentence enhancement for personally discharging a firearm in the course of committing an attempt murder does not violate the proportionate penalties clause. *Sharpe*, 216 Ill. 2d at 526.

¶ 73    Nonetheless, a defendant may bring an as-applied challenge to a mandatory sentencing statute. *Hilliard*, 2023 IL 128186, ¶ 21. The defendant must "ultimately overcome the presumption that the statute is constitutional by clearly establishing that the statute is invalid as applied to him." *Hilliard*, 2023 IL 128186, ¶ 21.

¶ 74    In *Hilliard*, the Illinois Supreme Court held that the 25-year mandatory firearm sentence enhancement, as applied to the 18-year-old adult defendant, did not violate the proportionate penalties clause of the Illinois Constitution. *Hilliard*, 2023 IL 128186. *Hilliard* found that the defendant's status as an adult distinguished his claim from the juvenile case law finding that mandatory firearm enhancements violated the proportionate penalties clause. *Hilliard*, 2023 IL 128186, ¶ 35.

20

¶ 75    The circuit court balances the goals of retribution and rehabilitation of the defendant and is given great discretion to sentence a defendant within the limits set by the legislature by statute. *People v. Haley*, 2011 IL App (1st) 093585, ¶ 63. The sentence for attempt first degree murder is the sentence for a Class X felony. 720 ILCS 5/8-4(c)(1) (West 2022). The sentencing range for a Class X felony is not less than 6 years and not more than 30 years. 730 ILCS 5/5-4.5-25(a) (West 2022). Additionally, a 20 year add-on shall be imposed by the court where a person personally discharged a firearm during an attempt to commit first degree murder. 720 ILCS 5/8-4(c)(1)(C) (West 2022).

¶ 76    The defendant received the statutory minimum possible sentence for a 21-year-old adult where the protections of *Miller* and its progeny are not applicable. The circuit court considered evidence in mitigation and considered the defendant's rehabilitative potential in imposing the lowest possible Class X sentence for attempt murder, as argued by defense counsel. The circuit court's determination that the defendant's decision to discharge a firearm at close range without provocation would not "shock the moral sense of the community" and the 26-year sentence would not be disproportionate to the offense.

¶ 77                                III. CONCLUSION

¶ 78    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 79    Affirmed.